# ATLANTIC REFINING CO. *v.* FEDERAL TRADE COMMISSION.

No. 292.  Argued March 30, 1965.—Decided June 1, 1965.*

---

*Together with No. 296, *Goodyear Tire & Rubber Co.* v. *Federal Trade Commission,* also on certiorari to the same court.

*Frederic L. Ballard, Jr.,* argued the cause for petitioner in No. 292. With him on the briefs were *Charles I. Thompson, Jr., Tyson W. Coughlin, Roy W. Johns, Joel L. Carr* and *Harry W. Gill, Jr.*

*John F. Sonnett* argued the cause for petitioner in No. 296. With him on the briefs were *Arthur Mermin, David Ingraham* and *Marshall H. Cox, Jr.*

*Daniel M. Friedman* argued the cause for respondent in both cases. With him on the brief were *Solicitor General Cox, Assistant Attorney General Orrick, Lionel Kestenbaum, James McI. Henderson, Alvin L. Berman* and *Lester A. Klaus.*

*Cecil E. Munn* filed a brief for Champlin Petroleum Co., as *amicus curiae,* urging reversal in No. 292.

*Harold T. Halfpenny* and *Mary M. Shaw* filed a brief for the Automotive Service Industry Association, as *amicus curiae,* urging affirmance in No. 292.

*William F. Kenney, William Simon* and *John Bodner, Jr.,* filed a brief for Shell Oil Co., as *amicus curiae,* in both cases.

MR. JUSTICE CLARK delivered the opinion of the Court.

The Federal Trade Commission has found that an agreement between the Atlantic Refining Company (Atlantic) and the Goodyear Tire & Rubber Company (Goodyear), under which the former "sponsors" the sale of the tires, batteries and accessory (TBA) products of the latter to its wholesale outlets and its retail service station dealers, is an unfair method of competition in violation of

§ 5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. § 45 (1964 ed.).[1]   Under the plan Atlantic sponsors the sale of Goodyear products to its wholesale and retail outlets on an overall commission basis.   Goodyear is responsible for its sales and sells at its own price to Atlantic wholesalers and dealers for resale; it bears all of the cost of distribution through its warehouses, stores and other supply points and carries on a joint sales promotion program with Atlantic.   The lat-

---

[1] Section 5 provides in pertinent part:

"(a) (1) Unfair methods of competition in commerce, and unfair . . . acts or practices in commerce, are declared unlawful.

.           .           .           .           .

"(6) The Commission is empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in commerce and unfair . . . acts or practices in commerce.

"(b) Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair . . . act or practice in commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. . . .   If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by [this Act], it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. . . .   After the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, the Commission may at any time, after notice and opportunity for hearing, reopen and alter, modify, or set aside, in whole or in part, any report or order made or issued by it under this section, whenever in the opinion of the Commission conditions of fact or of law have so changed as to require such action or if the public interest shall so require . . . ."

ter, however, is primarily responsible for promoting the sale of Goodyear products to its dealers and assisting them in their resale; for this it receives a commission on all sales made to its wholesalers and dealers. The hearing examiner, with the approval of the Commission and the Court of Appeals, enjoined the use of direct methods of coercion on the part of Atlantic upon its dealers in the inauguration and promotion of the plan. Atlantic does not seek review of this phase of the case. However, the Commission considered the coercive practices to be symptomatic of a more fundamental restraint of trade and found the sales-commission plan illegal in itself as "a classic example of the use of economic power in one market . . . to destroy competition in another market . . . ." 58 F. T. C. 309, 367. It prohibited Atlantic from participating in any such commission arrangement.[2] Similarly, it forbade

---

[2] Atlantic was ordered to cease and desist from:

"1. Entering [into] or continuing in operation or effect any contract, agreement or combination, express or implied, with The Goodyear Tire & Rubber Company, or The Goodyear Tire & Rubber Company, Inc., or with any other rubber company or tire manufacturer, or any other supplier of tires, batteries, and/or accessories, whereby The Atlantic Refining Company receives anything of value in connection with the sale of TBA products to any wholesaler or retailer of Atlantic petroleum products by any marketer or distributor of TBA products other than The Atlantic Refining Company;

"2. Accepting or receiving anything of value from any manufacturer, distributor, wholesaler, or other vendor of TBA products, for acting as sales agent or for otherwise sponsoring, recommending, urging, inducing, or promoting the sale of TBA products, directly or indirectly, by any such vendor to any wholesaler or retailer of Atlantic petroleum products;

"3. Using or attempting to use any contractual or other device, such as, but not limited to, agreements, leases, training programs, promotions, dealer meetings, dealer discussions, service station identification, credit cards, and financial loans, to sponsor, recommend, urge, induce, or otherwise promote the sale of TBA products by any distributor or marketer of such products other than The Atlantic

Goodyear from continuing the arrangement with Atlantic or any other oil company.[3] Goodyear and Atlantic filed separate appeals. The Court of Appeals approved the findings of the Commission and affirmed its order. "Ap-

Refining Company to or through any wholesaler or retailer of Atlantic petroleum products;

"4. Employing any method of inspecting, reporting, or surveillance or using or attempting to use, in any manner, its relationship with Atlantic outlets to sponsor, recommend, urge, induce, or otherwise promote the sale of any specified brand or brands of TBA products by any distributor or marketer of such products other than The Atlantic Refining Company to any wholesaler or retailer of Atlantic petroleum products;

"5. Intimidating or coercing or attempting to intimidate or coerce any wholesaler or retailer of Atlantic petroleum products to purchase any brand or brands of TBA products;

"6. Preventing or attempting to prevent any wholesaler or retailer of Atlantic [petroleum] products from purchasing and reselling, merchandising, or displaying TBA products of his own independent choice." 58 F. T. C., at 369–370.

[3] Goodyear was ordered to cease and desist from:

"1. Entering into or continuing in operation or effect any contract, agreement or combination, express or implied with The Atlantic Refining Company or with any other marketing oil company whereby Goodyear, directly or indirectly, pays or contributes anything of value to any such marketing oil company in connection with the sale of TBA products by Goodyear or any distributor of Goodyear products to any wholesaler or retailer of petroleum products of such marketing oil company;

"2. Paying, granting or allowing, or offering to pay, grant or allow, anything of value to The Atlantic Refining Company or to any [other] marketing oil company for acting as sales agent or for otherwise sponsoring, recommending, urging, inducing or promoting the sale of TBA products, directly or indirectly, by Goodyear or any distributor of Goodyear products to any wholesaler or retailer of petroleum products of such marketing oil company;

"3. Reporting or participating in the reporting to The Atlantic Refining Company or any other marketing oil company concerning sales of TBA products to wholesalers or retailers of petroleum products, individually or by groups, of any such marketing oil company." 58 F. T. C., at 370–371.

praising the broader aspects of the system [used by Atlantic and Goodyear] as a tying arrangement," it agreed with the Commission that it injured "competition in the distribution of TBA at the manufacturing, wholesale, and retail levels." 331 F. 2d 394, 402. We granted certiorari, 379 U. S. 943, because of the importance of the questions raised and especially in light of the holding of the Court of Appeals for the District of Columbia Circuit in *Texaco, Inc.* v. *Federal Trade Comm'n,* 118 U. S. App. D. C. 366, 336 F. 2d 754, which is in apparent conflict with these cases. We affirm the judgments of the Court of Appeals.

## I.

Since Atlantic has not sought review of paragraphs 5 and 6 of the Commission's order as to its use of overt acts of coercion on its wholesalers and retailers those portions of the order are final. We therefore do not set out in detail all of the facts which are so carefully examined in the opinion of the Court of Appeals.

Atlantic is a major producer, refiner and distributor of oil and its by-products. Its market is confined to portions of 17 States along the eastern seaboard.[4] Its distribution system consists of wholesale distributors who purchase gasoline and lubricants in large quantities and retail service station operators who do business either as lessees of Atlantic or as contract dealers selling its products. In 1955 Atlantic had 2,493 lessee dealers, who purchased 39.1% of its gasoline sales, and 3,044 contract dealers, who bought 18.1%.[5] About half of the contract

---

[4] In 1948 these States accounted for 36.7% of the gasoline sales in the United States. Atlantic's share of this market was 6.8%; its share of the national market was 2.5%. It had total operating revenues exceeding $500,000,000 in 1954.

[5] Lessee dealers lease their stations from Atlantic, while contract dealers either own their own stations or lease them from some party other than Atlantic.

dealers were service station operators; the remainder were operators of garages, grocery stores and other outlets which sell gasoline but do not handle tires, batteries and accessories.

Goodyear is the largest manufacturer of rubber products in the United States with sales of over $1,000,000,000 in 1954. It distributes tires, tubes and accessories through 57 warehouses located throughout the country. It does not warehouse batteries; "Goodyear" batteries are tradenamed by it but manufactured and directly distributed to Goodyear outlets by the Electric Auto-Lite Company and Gould-National Batteries, Inc. Goodyear also sells its products at wholesale and retail through about 500 company-owned stores and through numerous independent dealers. These independent franchised dealers number more than 12,000, there being among them a number of Atlantic wholesale petroleum distributors and retail petroleum jobbers. Goodyear has also had a substantial number of nonfranchised dealers which includes most service station customers, including the Atlantic stations involved here.

Gasoline service stations are particularly well suited to sell tires, batteries and accessories. They constitute a large and important market for those products. Since at least 1932 Atlantic has been distributing such products to its dealers. In 1951 it inaugurated the sales-commission plan.[6] Its contract with Goodyear covered three

---

[6] Prior to 1951 Atlantic distributed tires, batteries and accessories to its dealers through a purchase-resale plan, whereby it would purchase Lee tires, Exide batteries and various accessories directly from the manufacturers and resell them to its dealers and wholesalers.

Atlantic also entered into a sales-commission agreement with the Firestone Tire & Rubber Company in 1951. Firestone products were to be marketed in the Eastern Pennsylvania, Western Pennsylvania and Southern regions of Atlantic's sales territory, but Firestone is not a party to this action.

regions: Philadelphia-New Jersey, New York State and New England.

The Goodyear-Atlantic agreement required Atlantic to assist Goodyear "to the fullest practicable extent in perfecting sales, credit, and merchandising arrangements" with all of Atlantic's outlets. This included announcement to its dealers of its sponsorship of Goodyear products followed by a field representative's call to "suggest . . . the maintenance of adequate stocks of merchandise" and "maintenance of proper identification and advertising" of such merchandise.[7] Atlantic was to instruct its salesmen to urge dealers to "vigorously" represent Goodyear, and to "cooperate with and assist" Goodyear in its "efforts to promote and increase the sale" by Atlantic dealers of Goodyear products. And it was to "maintain adequate dealer training programs in the sale of tires, batteries, and accessories." In addition, the companies organized joint sales organization meetings at which plans were made for perfecting the sales plan. One project was a "double teaming" solicitation of Atlantic outlets by representatives of both companies to convert them to Goodyear products. They were to call on the dealers together, take stock orders, furnish initial price lists and project future quotas of purchases of Goodyear products. Goodyear also required that each Atlantic dealer be assigned to a supply point maintained by it, such as a warehouse, Goodyear store, independent dealer or designated Atlantic distributor or retail dealer. Atlantic would not receive any commission on purchases made outside of an assigned supply point. Its commission of 10% on sales to Atlantic dealers and 7.5% on sales to its wholesalers was paid on the basis of a master sheet prepared

---

[7] While Atlantic controlled the placement of advertising in the dealers' stations, Goodyear furnished and erected the displays. Atlantic permitted no signs or displays other than those of sponsored products.

by Goodyear and furnished Atlantic each month. This list was broken down so as to show the individual purchases of each dealer (except those whose supply points for Goodyear products were Atlantic wholesalers). Under this reporting technique, the Commission found, "Atlantic may determine the exact amount of sponsored TBA purchased by each Atlantic outlet . . . ." 58 F. T. C. 309, 351. Goodyear also furnished, this time at the specific request of Atlantic, a list of the latter's recalcitrant dealers who refused to be identified with the "Goodyear Program." These lists Atlantic forwarded to its district offices for "appropriate action." On one occasion a list of 46 such dealers was furnished Atlantic officials by Goodyear. The Commission found that "the entire group . . . was thereafter signed to Goodyear contracts and Goodyear advertising signs were installed at their stations." *Id.*, at 346–347.

The effectiveness of the program is evidenced by the results. Within seven months after the agreement Goodyear had signed up 96% and 98%, respectively, of Atlantic's dealers in two of the three areas assigned to it. In 1952 the sale of Goodyear products to Atlantic dealers was $4,175,890—40% higher than Atlantic's sales during the last year of its purchase-resale plan with Lee tires and Exide batteries. By 1955 these sales of Goodyear products amounted to $5,700,121. Total sales of Goodyear and Firestone products from June 1950 to June 1956 were over $52,000,000. This enormous increase, the findings indicate, was the result of the effective policing of the plan. The reports of sales by Goodyear to Atlantic enabled it to know exactly the amount of Goodyear products the great majority of its dealers were buying.

The Commission stressed the evidence showing that "Atlantic dealers have been orally advised by sales officials of the oil company that their continued status as Atlantic

dealers and lessees will be in jeopardy if they do not purchase sufficient quantities of sponsored" tires, batteries and accessories. *Id.,* at 342. Indeed, some dealers lost their leases after being reported for not complying with the Goodyear sales program. But we need not detail this feature of the case since Atlantic has conceded the point by not perfecting an appeal thereon.

## II.

Section 5 of the Federal Trade Commission Act declares "[u]nfair methods of competition in commerce, and unfair . . . acts or practices in commerce . . . unlawful." In a broad delegation of power it empowers the Commission, in the first instance, to determine whether a method of competition or the act or practice complained of is unfair. The Congress intentionally left development of the term "unfair" to the Commission rather than attempting to define "the many and variable unfair practices which prevail in commerce . . . ." S. Rep. No. 592, 63d Cong., 2d Sess., 13. As the conference report stated, unfair competition could best be prevented "through the action of an administrative body of practical men . . . who will be able to apply the rule enacted by Congress to particular business situations, so as to eradicate evils with the least risk of interfering with legitimate business operations." H. R. Conf. Rep. No. 1142, 63d Cong., 2d Sess., 19. In thus divining that there is no limit to business ingenuity and legal gymnastics the Congress displayed much foresight. See *Federal Trade Comm'n* v. *Cement Institute,* 333 U. S. 683, 693 (1948). Where the Congress has provided that an administrative agency initially apply a broad statutory term to a particular situation, our function is limited to determining whether the Commission's decision "has 'warrant in the record' and a reasonable basis in law." *Labor Board* v. *Hearst*

*Publications, Inc.,* 322 U. S. 111, 131 (1944). While the final word is left to the courts, necessarily "we give great weight to the Commission's conclusion . . . ." *Federal Trade Comm'n* v. *Cement Institute, supra,* at 720.

### III.

Certainly there is "warrant in the record" for the findings of the Commission here. Substantial evidence supports the conclusion that notwithstanding Atlantic's contention that it and its dealers are mutually dependent upon each other, they simply do not bargain as equals. Among the sources of leverage in Atlantic's hands are its lease and equipment loan contracts with their cancellation and short-term provisions. Only last Term we described the power implications of such arrangements in *Simpson* v. *Union Oil Co.,* 377 U. S. 13 (1964), and we need not repeat that discussion here. It must also be remembered that Atlantic controlled the supply of gasoline and oil to its wholesalers and dealers. This was an additional source of economic leverage, *United States* v. *Loew's, Inc.,* 371 U. S. 38, 45 (1962), as was its extensive control of all advertising on the premises of its dealers.

Furthermore, there was abundant evidence that Atlantic, in some instances with the aid of Goodyear, not only exerted the persuasion that is a natural incident of its economic power, but coupled with it direct and overt threats of reprisal such as are now enjoined by paragraphs 5 and 6 of the order. Indeed, the Commission could properly have concluded that it was for this bundle of persuasion that Goodyear paid Atlantic its commission. We will not repeat the manner in which this sponsorship was carried out. It is sufficient to note that the most impressive evidence of its effectiveness was its undeniable success within a short time of its inception. In 1951, seven months after the sales-commission plan had gone into effect, Goodyear had enjoyed great success in signing

contracts with Atlantic dealers despite the fact that a 1946–1949 survey had shown that 67% of the dealers had preferred Lee tires and 76% Exide batteries.

With this background in mind, we consider whether there was a "reasonable basis in law" for the Commission's ultimate conclusion that the sales-commission plan constituted an unfair method of competition.

## IV.

At the outset we must stress what we do not find present here. We recognize that the Goodyear-Atlantic contract is not a tying arrangement. Atlantic is not required to tie its sale of gasoline and other petroleum products to purchases of Goodyear tires, batteries and accessories. Nor does it expressly require such purchases of its dealers. But neither do we understand that either the Commission or the Court of Appeals held that the sales-commission arrangement was a tying scheme. What they did find was that the central competitive characteristic was the same in both cases—the utilization of economic power in one market to curtail competition in another. Here that lever was bolstered by actual threats and coercive practices. As our cases hold, all that is necessary in § 5 proceedings to find a violation is to discover conduct that "runs counter to the public policy declared in the" Act. *Fashion Originators' Guild* v. *Federal Trade Comm'n*, 312 U. S. 457, 463 (1941). But this is of necessity, and was intended to be, a standard to which the Commission would give substance. In doing so, its use as a guideline of recognized violations of the antitrust laws was, we believe, entirely appropriate. It has long been recognized that there are many unfair methods of competition that do not assume the proportions of antitrust violations. *Federal Trade Comm'n* v. *Motion Picture Advertising Service Co.*, 344 U. S. 392, 394 (1953). When conduct does bear the characteristics

of recognized antitrust violations it becomes suspect, and the Commission may properly look to cases applying those laws for guidance.

Although the Commission relied on such cases here, it expressly rejected a mechanical application of the law of tying arrangements. Rather it looked to the entire record as a basis for its conclusion that the activity of Goodyear and Atlantic impaired competition at three levels of the tires, batteries and accessories industry. It found that wholesalers and manufacturers of competing brands, and even Goodyear wholesalers who were not authorized supply points, were foreclosed from the Atlantic market. In addition, it recognized the obvious fact that Firestone and Goodyear were excluded from selling to Atlantic's dealers in each other's territories. Both of these effects on competition flowed from the contract itself. It also found that the plight of Atlantic wholesalers and retailers was equally clear. They had to compete with other wholesalers and retailers who were free to stock several brands, but they were effectively foreclosed from selling brands other than Goodyear. This restraint is in this respect broader than the one found in *International Salt Co. v. United States,* 332 U. S. 392 (1947), where the dealers could stock other salt if they could buy it at lower prices. Here the dealers could buy only at Goodyear's price.

Thus the Commission was warranted in finding that the effect of the plan was *as though* Atlantic had agreed with Goodyear to require its dealers to buy Goodyear products and had done so. It is beyond question that the effect on commerce was not insubstantial. In *International Salt Co.,* the market foreclosed was $500,000 annually. Firestone and Goodyear sales alone exceeded $11,000,000 in 1955 and $50,000,000 in six years, and more than 5,500 retailers and wholesalers were affected.

Goodyear and Atlantic contend that the Commission should have made a far more extensive economic analysis of the competitive effect of the sales-commission plan, examining the entire market in tires, batteries and accessories. But just as the effect of this plan is similar to that of a tie-in, so is it unnecessary to embark upon a full-scale economic analysis of competitive effect. We think it enough that the Commission found that a not insubstantial portion of commerce is affected. See *United States* v. *Loew's, Inc.,* 371 U. S. 38, 45, n. 4 (1962); *International Salt Co.* v. *United States,* 332 U. S. 392 (1947).

Nor can we say that the Commission erred in refusing to consider evidence of economic justification for the program. While these contracts may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers they also amount to a device that permits suppliers of tires, batteries and accessories, through the use of oil company power, to effectively sew up large markets. Upon considering the destructive effect on commerce that would result from the widespread use of these contracts by major oil companies and suppliers, we conclude that the Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves. *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 6–7 (1958).

The short of it is that Atlantic, with Goodyear's encouragement and assistance, has marshaled its full economic power in a continuing campaign to force its dealers and wholesalers to buy Goodyear products. The anticompetitive effects of this program are clear on the record and render unnecessary extensive economic analysis of market percentages or business justifications in determining whether this was a method of competition which Congress has declared unfair and therefore unlawful.

## V.

We now turn to the matter of relief. As we have said, the Commission's order forbids Atlantic's participation in any contract with any supplier of tires, batteries and accessories whereby it receives anything of value in connection with the sale of such products by any marketer. It also prohibits Goodyear from continuing or effecting any contract with Atlantic, "or with any other marketing oil company," whereby Goodyear pays anything of value to the oil company in connection with the sale of tires, batteries and accessories by Goodyear to wholesalers or retailers of the oil company.

1. We first consider Atlantic, whose major argument is that the order is arbitrary and goes too far. It disallows the sales-commission plan, Atlantic says, but permits reinstitution of the old purchase-resale plan even though the latter has the same anticompetitive effects and is a less effective method of distribution. This position flows from the language of the order which prohibits Atlantic's receipt of anything of value in connection with the sale of tires, batteries and accessories by any marketer "other than The Atlantic Refining Company." The merits of the purchase-resale plan, however, were not before the Commission and we therefore have no occasion to pass upon them. Nor do we believe that the order is too broad. Section 5 (b) empowers the Commission to issue a cease-and-desist order against anyone using an unfair method of competition in commerce. The Commission was of the opinion that to enjoin the use of overt coercive tactics was insufficient. We think it was justified in this conclusion. The long existence of the plan itself, coupled with the coercive acts practiced by Atlantic pursuant to it, warranted a decision to require more. The Commission could have decided that to uproot the practice required its complete prohibition; otherwise dealers would

not enjoy complete freedom from unfair practices which the Act condemns. These are matters well within the ambit of the Commission's authority.

2. As for Goodyear we hold that the order is entirely within the power of the Commission. Both the Commission and the Court of Appeals stressed that the sales-commission plan enabled Goodyear "to integrate [into] its own nationwide distribution system the economic power possessed by Atlantic over its wholesale and retail petroleum outlets." 58 F. T. C., at 348. In addition, the Commission dedicated a considerable portion of its opinion to Goodyear's role in carrying it out. Thus, although it is the oil company's power and overt acts toward its outlets that outlaw the commission plan, the Commission was not restricted solely to an examination of its activity. Rather, in deciding upon the relief to be entered against Goodyear, it could appropriately consider its propensity for harnessing and utilizing that power. Because of the relevance of that evidence to our present inquiry we will consider it here in some detail.

Goodyear was no silent or inactive partner in the implementation of the sales-commission plan. It did not simply sit back and passively accept whatever benefits might accrue to it from the Atlantic contract. Indeed, the most striking aspect of the program, in the Commission's view, was the degree to which the petitioners worked together to achieve the program's success. A Goodyear representative put it very neatly when he said: "After years of courtship Atlantic and Goodyear have wed. . . . We welcome wholeheartedly this merger."

Examples of this close cooperation were numerous. Atlantic had a rather large turnover in dealerships, as well as a substantial number of new station openings each year. With the selection of persons to man these stations, Goodyear supply points were notified by Atlantic before they actually began operations, thus allowing

Atlantic-Goodyear teams an opportunity to call on the prospective dealer, to get initial orders before local competitors and to condition acceptance of the Goodyear line. Goodyear brands were used for demonstration in Atlantic training schools for these new dealers, and discussions of tires, batteries and accessories at these schools were often conducted by representatives of both Atlantic and Goodyear.

Moreover, Atlantic gave Goodyear lists of its dealers so that the latter could remove advertising for other products and replace it with its own. Goodyear sent lists of dealers refusing to accept its advertising to Atlantic for "appropriate action"; and it will be recalled that on one occasion when a list of 46 such dealers was forwarded to Atlantic, all soon fell into line. This is a particularly impressive example of Goodyear's inclination to use Atlantic's power for its own benefit. And there are more.

The reporting technique used by petitioners was especially revealing. Through it, Atlantic could determine the exact amount of sponsored products purchased by each Atlantic retail outlet from its assigned supply point. Goodyear supplied this information *sua sponte* insofar as the record shows. Ostensibly it was used in determining commissions due Atlantic. What makes it suspect is the detail with which it was compiled—wholly unnecessary for commission-payment purposes. Its potential use for channeling pressures upon recalcitrant dealers is obvious. And when considered alongside the admitted overt coercive practices of Atlantic, this list becomes a potent device in ensuring the success of the program.

The Commission also found that Goodyear and Atlantic concluded that the most effective merchandising tactic was dual solicitation or so-called "double-teaming." Goodyear relied heavily on this technique and had urged it on the oil companies in a 1951 letter from its sales-commission program manager. The Commission found

that "Goodyear thus appeared confident that the presence of an Atlantic salesman together with the Goodyear representative would render unnecessary any higgling or haggling over price *before* obtaining an initial order for TBA from Atlantic dealers." 58 F. T. C., at 355. (Emphasis in original.) Goodyear's confidence was justified, for as the Commission observed, the annual dealer evaluation by Atlantic salesmen carried substantial weight when the district managers decided upon annual lease extensions, and dealers were therefore understandably susceptible to the encouragement of Goodyear salesmen when Atlantic men were nearby looking over their shoulders. Thus, the Commission was well justified in concluding that Goodyear had in effect purchased a "captive market."

With the preceding discussion in mind, we turn to Goodyear's relationships with other oil companies. As of December 1964 it had sales-commission agreements with 20 other oil companies. Nine of these contracts were before the Commission in the instant case and were found to be "in all material respects identical with the Goodyear-Atlantic contract." *Id.,* at 352. They similarly require the companies to assist actively in the "selling and promotion" of Goodyear products. There is specific evidence in the record of the short-term lease agreements used by Shell, Sinclair and Sherwood Bros., three of the companies with which Goodyear has such agreements. Moreover, there was some indication that only three oil companies use three-year leases. Furthermore, there was evidence of practices by at least four oil companies and Goodyear similar to those existing under the Atlantic arrangement. These included threats as well as more subtle pressures.

Goodyear complains that there is no evidence of the economic power of many of the companies with which it has sales-commission plans. However, the Commis-

sion's order does not directly restrict the activities of these companies. Goodyear, on the other hand, was before the Commission and was found to be a transgressor. There was substantial evidence of its propensity to use the power structure of Atlantic and at least four other oil companies to further its own distribution program. Nor is it any objection for Goodyear to claim that it did not exert any overt coercive pressures on the oil companies' outlets. It is of little consequence that Atlantic actually applied the pressure. For so close was the teamwork of the two companies that, even with blinders on, Goodyear could not have been ignorant of those practices. It is difficult to escape the conclusion that there would have been little point in paying substantial commissions to oil companies were it not for their ability to exert power over their wholesalers and dealers—an ability adequately demonstrated on this record. Its allowance of these substantial overriding commissions in fact paid off handsomely. Goodyear's sales under its various sales-commission contracts rose from $16,700,000 in 1951 to $36,000,000 in 1955.

The Commission, of course, has "wide discretion in its choice of a remedy deemed adequate to cope with . . . unlawful practices . . . ." *Jacob Siegel Co.* v. *Federal Trade Comm'n,* 327 U. S. 608, 611 (1946). Furthermore, it acts within the limits of its authority when it bars repetitions of similar conduct with other parties. *Federal Trade Comm'n* v. *Henry Broch & Co.,* 368 U. S. 360, 364 (1962). There was ample evidence establishing on Goodyear's part a course of conduct lasting over 14 years aimed at utilizing oil company power structures to curtail competition in tires, batteries and accessories. We think that the Commission could appropriately conclude that this course of conduct required forbidding the use of sales-commission plans by Goodyear completely.

This order does not necessarily prohibit Goodyear from making contracts with companies not possessed of eco-

nomic power over their dealers. The evidence in this particular record, however, does involve relationships such as it has enjoyed with Atlantic and its propensity to use those relationships for an unfair competitive advantage. Goodyear offered no evidence that it has arrangements differing from those mentioned in the instant case. In these circumstances it is sufficient to point out that in the event it has such a contract with such a company it may seek a reopening of the order approved today. The Commission has statutory power to reopen and modify its orders at all times. But Congress has placed in the Commission in the first instance the power to shape the remedy necessary to deal with unfair methods of competition. We will interfere only where there is no reasonable relation between the remedy and the violation. *Federal Trade Comm'n* v. *Ruberoid Co.*, 343 U. S. 470, 473 (1952). On this record we cannot say that the Commission's remedy is unreasonable and the judgments are therefore

*Affirmed.*

MR. JUSTICE STEWART, whom MR. JUSTICE HARLAN joins, dissenting.

That part of the Commission's order enjoining the petitioners from engaging in "coercive conduct" designed to compel Atlantic dealers to handle Atlantic-sponsored tires, batteries, and accessories is clearly correct. There is ample evidence that Atlantic coerced its dealers into the exclusive handling of the sponsored goods by threatening the cancellation of dealer franchises. Not only was there direct evidence of the making of such threats; the nearly universal shift to Goodyear's products, coming shortly after the dealers expressed their preference for competing brands, would itself indicate that the change was wrought by something more than simple persuasion. On the basis of this evidence, the Commission reasonably concluded that Atlantic had imposed on its dealers an arrangement

whereby continued maintenance of their relationship with Atlantic depended upon their handling the sponsored products, despite the absence of contractual terms to this effect and Atlantic's protests that its "official" policy was one of free choice.

But granting that the Commission validly found that the petitioners had engaged in coercive practices amounting to a violation of § 5 of the Act does not lead me to conclude that its order enjoining the use of any sales-commission plan of distribution is supportable. In essence, the sales-commission agreement between Atlantic and Goodyear provided Atlantic with a commission on all sales made by Goodyear to the Atlantic dealers in exchange for Atlantic's sponsorship of the Goodyear products. The responsibility for making the sales and deliveries was Goodyear's, though Atlantic undertook to engage in various activities in support of the Goodyear sales effort. This method of distribution was adopted by Atlantic to replace a purchase-resale plan which it had previously employed and found unsatisfactory. Under the purchase-resale plan, Atlantic purchased the tires, batteries, and accessories, warehoused them, and sold them to its dealers. The principal advantage accruing to Atlantic from adoption of the sales-commission plan was that it enabled Atlantic to dispense with maintaining its own storage and distribution facilities. Under both systems, Atlantic had a financial interest in the sale of the sponsored products and, for all that appears, the same incentive to maximize its dealers' purchases of them.

There is no reason to assume that the sales-commission plan of distribution gave to Atlantic any distinctive capacity to effect the arrangement which is the gravamen of the violation proved. The core of that violation is Atlantic's coercion of its dealers into handling only sponsored products by threatening to cancel their franchises and indulging in a variety of related coercive practices, thereby

raising substantial barriers to competition in that segment of the market for tires, batteries, and accessories represented by its dealers. This it could have done as easily under the sales-commission plan, the purchase-resale plan, or any plan of distribution which gave it a financial interest in the sale of any particular line of tires, batteries, and accessories.

Indeed the Commission itself recognized that whatever power Atlantic may have over its dealers does not derive from this particular means of distribution:

> "Atlantic has sufficient economic power with respect to its wholesale and retail petroleum distributors to cause them to purchase substantial quantities of sponsored TBA even without the use of overt coercive tactics or of written or oral tying agreements, and this power is a fact existing independently of the particular method of distributing or sponsoring TBA used by Atlantic." *

Therefore, to the extent that the Commission's order is based on the premise that the sales-commission plan confers upon Atlantic some distinctive capacity to coerce its dealers into handling sponsored products, and thereby exclude competing suppliers, it is without foundation. Insofar as this exclusion resulted from threats of franchise cancellation and related coercive tactics, that part of the order directed at these practices will afford the necessary relief.

The Commission's order need not be justified on a showing that the plan confers any distinctive capacity for coercion upon Atlantic, however, if it can be demonstrated that the plan is merely one variant of a broader category of activity which could be prohibited under § 5. It would be less than candid to deny that aggressive salesmanship by Atlantic representatives is apt to meet with more than

---

*58 F. T. C. 309, at 364–365.

ordinary success when directed at Atlantic dealers, even though the most scrupulous obedience is accorded to the Commission's order prohibiting coercion. Given the disparity of financial resources and the natural desire of the dealers to maintain a cordial relationship with Atlantic, some competitive advantage will necessarily accrue to Atlantic's sponsorship of a particular line of tires, batteries, and accessories under any plan of distribution. This advantage is the inevitable result of the market structure in which Atlantic and its dealers find themselves, and has nothing to do with the particular method which Atlantic might use to market a line of products. The disparity in size and financial strength, the short term of the prevailing leases, the dire financial consequences attendant upon lease cancellation, and the established market preference for certain brands of gasoline—all contribute to give Atlantic a leverage over its dealers and a corresponding power to effect some exclusion of competition.

The Commission's order can thus be understood as a measure to prevent such exclusion by taking a step toward the total exclusion of Atlantic from the marketing of tires, batteries, and accessories. Indeed, once it is conceded that the sales-commission plan makes no distinctive contribution to Atlantic's coercive capacity, this would seem the only conceivable justification for the Commission's order. This justification, however, is without foundation in law, for it assumes that § 5 of the Federal Trade Commission Act, which proscribes unfair methods of competition, prohibits the marketing of complementary goods by a manufacturer or processor enjoying some undefined measure of economic leverage *vis-à-vis* his distributors. So long as the manufacturer does enjoy some such leverage, his marketing of complementary goods through an established system of distributorships will tend to effect some exclusion of competition, whether those goods be

distributed by another through a sales-commission plan, or purchased and resold by the manufacturer, or indeed manufactured and sold by him.

I cannot believe that § 5 was intended to allow the Commission to block the expansion of an enterprise into the marketing of such complementary items. Section 5 prohibits unfair methods of competition. The coercive practices enjoined by paragraphs five and six of the order apart, no unfairness is claimed in any of the practices employed by Atlantic. All concede that the continuing exclusionary pressure, to the extent it exists, derives from the imbalance of economic power between the two parties, rather than from any unfair feature of the sales-commission plan. To use an unfair practice charge to punish an enterprise for consequences inevitably flowing from its position in the structure of commerce is a grave distortion of the statute, imposing a massive and unjustifiable restraint on entrepreneurial action. Henceforth, large concerns marketing their products through smaller distributors stand vulnerable to the charge that their methods of competition are unfair because they have done no more than add a complementary product to those already sold through their distributors. I can find no warrant for this position in the words of the statute, in the economic policy it reflects, or in any of the cases decided under it.

In short, there is no justification whatever for that part of the Commission's order which prohibits the petitioners from employing the sales-commission plan of distribution. An order based on the premise that the Commission could enjoin Atlantic from any marketing at all of tires, batteries, and accessories is without foundation in the statute; an order based on the premise that the plan confers on Atlantic some distinctive capacity for coercion is without foundation in fact. Baseless in fact and in law, this order inflicts significant and undeserved damage upon Atlantic. Unjustifiable Commission orders imposing such

damage on corporate enterprise, and ultimately on the public, cannot be sanctioned by invocation of abstractions regarding the deference properly owed expert tribunals in devising remedial measures. It is to avoid just such errors as inhere in this order that the power of judicial review was granted to the courts—errors which, serving no public purpose, impose senseless damage on the private sector of our economy.

For these reasons I would reverse the judgment of the Court of Appeals approving the Commission's prohibition of the use of the sales-commission plan by Atlantic. I think the Commission's order as to Goodyear should likewise have been set aside by the Court of Appeals. That order is not only riven with the same defects, but in addition prohibits Goodyear from entering into sales-commission agreements with oil companies which, so far as we know, have never practiced the coercive techniques used by Atlantic, and which are not in a position to exercise any leverage at all over their dealers.

MR. JUSTICE GOLDBERG, dissenting.

I would vacate the judgments below and remand these cases to the Commission, since in my view the Commission has not set forth the basis for its broad orders with sufficient clarity and completeness, so that they can be properly reviewed. Cf. *United States* v. *Chicago, M., St. P. & P. R. Co.,* 294 U. S. 499, 511; *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 197; *Burlington Truck Lines* v. *United States,* 371 U. S. 156; *Labor Board* v. *Metropolitan Ins. Co.,* 380 U. S. 438.

Atlantic does not here dispute the fact that it engaged in practices to coerce its dealers into purchasing the sales-commission-sponsored TBA. Moreover, I agree with the Court that the record is sufficient to support the finding that Goodyear participated in these coercive practices. *Ante,* at 373–375. Therefore, I would have no difficulty

in affirming the Commission's orders if the Commission had ordered Atlantic and Goodyear to cease using sales-commission TBA plans as a remedy necessary to cure these coercive practices and prevent their recurrence. See *United States* v. *Loew's, Inc.*, 371 U. S. 38, 53.

The Commission's opinion however, does not appear to rest these orders on such a basis. Rather, it considered Atlantic's coercive activities "as mere symptoms of a more fundamental restraint of trade *inherent in the sales commission itself.*" 58 F. T. C. 309, 348. (Emphasis added.) Apparently it was because the Commission believed that Atlantic's participation in a sales-commission plan inherently restricted its dealers' free choice in TBA purchasing that it enjoined Atlantic and Goodyear from entering into any sales-commission plans, with each other or others. It is on this basis that the Commission action must be reviewed. The propriety of agency action must be judged "solely by the grounds invoked by the agency," *Securities Comm'n* v. *Chenery Corp.*, 332 U. S. 194, 196. See *Labor Board* v. *Metropolitan Ins. Co., supra; Burlington Truck Lines* v. *United States, supra,* at 168.

When looked at on this basis, however, it becomes obvious that the Commission has not supported its decision with adequate findings and conclusions, set forth with sufficient clarity, so that proper review is possible. This is seen when the Commission's opinion is analyzed and read in conjunction with its orders, particularly its order enjoining Goodyear from participating in sales-commission arrangements with any oil company.

Apparently the Commission's conclusion that the Atlantic-Goodyear sales-commission plan operates as an inherently unfair method of competition was based upon a determination that the Atlantic dealers were in an economically subservient position to Atlantic. This determination in turn was founded upon the facts that the Atlantic lease-franchise arrangements were only for short one-year terms

enabling Atlantic to terminate them without cause at the end of any year and that it was the practice of many of the dealers to borrow money from Atlantic in order to stock their inventories. This subservient position of the dealers was held to put them in a position where "Atlantic has sufficient economic power with respect to its wholesale and retail petroleum distributors to cause them to purchase substantial quantities of sponsored TBA even without the use of overt coercive tactics or of written or oral tying agreements, and this power is a fact existing independently of the particular method of distributing or sponsoring TBA used by Atlantic." 58 F. T. C., at 364–365.

Though apparently deciding this case on the basis of Atlantic's economic power over its dealers, the Commission then enjoined Goodyear from continuing existing sales-commission arrangements or entering into new ones with any oil company. This was done without any analysis of the relationship which other oil companies may have with their dealers. The Commission determined only the following with respect to other oil companies: (1) the sales-commission contracts between Goodyear and the other oil companies are in all material respects identical to the Goodyear-Atlantic sales-commission contract and (2) one of the other 20 oil companies with which Goodyear has these sales-commission contracts has, in the past, practiced coercion on its dealers. 58 F. T. C., at 352–353. Moreover, in a related case, the Commission expressly held illegal a TBA sales-commission arrangement between Texaco Inc. and the B. F. Goodrich Company without analysis of the relationship between Texaco and its dealers. See *Texaco, Inc.* v. *FTC*, 118 U. S. App. D. C. 366, 336 F. 2d 754 (C. A. D. C. Cir.). This case and another related case, *The Firestone Tire & Rubber Company,* 58 F. T. C. 371, resulted in both B. F. Goodrich and Firestone, as well as Goodyear, being enjoined from

engaging in any sales-commission plan with any oil company.

Moreover, the Commission in this case relied upon the facts "that Atlantic, which describes itself as '. . . a large producer and distributor of petroleum products' whose operating revenue 'totalled more than one half billion dollars' in 1954, distributes gasoline directly to more than 5,500 retail service stations and through wholesale distributors to more than 2,800 additional service stations in 17 states along the Atlantic Seaboard. Approximately 81 percent of Atlantic's total sales of gasoline in 1955 were accounted for by these approximately 8,300 retail service stations." 58 F. T. C., at 364. These facts were stated to show that Atlantic's position in the petroleum retail market was sufficiently great so as to make its dealerships desirable and unique and that, therefore, Atlantic had power over its dealers sufficient to induce them to buy Atlantic-sponsored TBA. Yet, while relying on these facts about Atlantic, the Commission made no distinction between large or small companies in its order that precluded Goodyear from participating in any sales-commission plan. And, as discussed above, in related cases, B. F. Goodrich and Firestone as well have been enjoined from participating in any TBA sales-commission plan, regardless of the size of the oil company or its relation to its dealers.

An *amicus* brief filed on behalf of a small oil company asserts, however, that small oil companies need sales-commission TBA plans in order to compete effectively with the large companies. Since the Commission had only large companies before it in these cases, however, this contention has not adequately been explored. Despite this fact, the Commission has clearly precluded Goodyear, Firestone and B. F. Goodrich from entering into sales-commission arrangements with any oil company no matter how small the company and no matter what the

competitive factors involved are. Moreover, the Commission's opinion here, while again not unambiguous on the point, indicates that it would be *per se* an unfair method of competition for any tire company to enter into a sales-commission TBA promotion arrangement with any oil company. Yet the whole basis for such a holding rests upon the limited economic facts of the Atlantic situation. This is not to say that the Commission could not conclude, after adequate factual determinations, that a general rule applicable to all companies is correct. It is to say that the Commission must have before it a sufficient record and must make the necessary findings supportive of a rule of broad application before a reviewing court can adequately perform its function.

Finally, the opinion and order of the Commission seem to draw a distinction between sales-commission and purchase-resale methods of oil company TBA promotion. These are alternative methods by which oil companies sponsor TBA purchasing by their dealers. In fact, prior to 1951, Atlantic distributed TBA through a purchase-resale plan. Atlantic-sponsored TBA was purchased by Atlantic from various manufacturers and distributed to the Atlantic dealers through warehouses owned by Atlantic. In some areas the warehouses were supplemented by Atlantic dealers who acted as supply point subdistributors to other dealers. In March 1951, Atlantic changed from the purchase-resale method to the sales-commission plan for the announced reason that the latter arrangement would produce a substantial saving in operating and capital costs, plus a substantial improvement in service to Atlantic dealers. Under the sales-commission plan, the tire company—rather than the oil company—performs the distribution function. The sponsored TBA is manufactured or purchased by the tire company and is distributed through warehouses owned by the tire company. Also, the tire company uses as supply points its

own outlets (both company-owned and independent) as well as some oil company dealers, who are franchised by the tire company for this purpose. Under both purchase-resale and sales-commission plans, the oil company is primarily responsible for selling the TBA to its dealers and assisting them in selling it to their motorist customers. Under both plans the tire company salesman occasionally accompanies the oil company salesman to explain new TBA products, but the day-to-day promoting and selling are done by the oil company salesman.

In its order the Commission enjoined Atlantic from using any sales-commission TBA plan, but expressly excepted from the injunction the use by Atlantic of a purchase-resale TBA arrangement. This exception was made over the objection of the Commission staff that both methods of TBA sponsorship should be condemned and enjoined. In answer to the argument that it is irrational to condemn sales-commission systems but not purchase-resale plans, the Commission did not even attempt to distinguish the two based on any difference concerning what it considered to be the essential core of the violation by Atlantic, "the use [by the oil company] of economic power in one market (here, gasoline distribution) to destroy competition in another market (TBA distribution)." 58 F. T. C., at 367. Indeed, it would seem difficult to draw any distinction between the two plans on this basis. While the Commission did attempt to distinguish the two systems on other bases, this crucial aspect of the decision was handled in a short, summary fashion, without factual findings or analysis. Moreover, the Commission did not even discuss the argument that any distinction which permits purchase-resale but prohibits sales-commission plans discriminates against the smaller oil companies in favor of larger companies. It has been argued earnestly by an *amicus* that the capital investment required for a purchase-resale plan is so great that the

smaller oil companies cannot afford it and presently only the very large Gulf and Esso companies use such a method. The record in this case is clear that Atlantic switched from purchase-resale to sales-commission TBA promotion since it found the capital costs of purchase-resale to be unduly onerous.

In his brief in this Court the Solicitor General, on behalf of the Commission, did not even argue that there was a rational distinction between purchase-resale and sales-commission TBA plans. Rather he argued that the Commission had not really approved the purchase-resale plan in failing to enjoin Atlantic's use of it. This argument fails to account for the language of the Commission opinion and the fact that the Commission rejected the staff recommendation, both of which to me are quite persuasive for the conclusion that the Commission has approved purchase-resale. Moreover, it ignores the fact that in the related *Firestone* case the Commission distinguished its earlier decision in *General Motors Corp.*, 34 F. T. C. 58, which, while condemning and enjoining coercion, did not condemn General Motors' plan of inducing its dealers to buy General Motors automotive parts and accessories. A major ground used by the Commission in distinguishing the *General Motors* case from the TBA cases, was that the *General Motors* case involved a purchase-resale plan whereas the TBA cases before the Commission involve sales-commission arrangements. While it would therefore seem to me on the current state of the record that the Commission has approved purchase-resale TBA promotion by oil companies while condemning similar sales-commission promotions, at the very least, this is yet another ambiguity in the opinion.

In short, the Commission opinions in this and the related cases are bathed in confusion and leave unanswered a number of questions necessarily involved in the decision of these cases. Are TBA sales-commission plans only un-

fair methods of competition if the oil company has used coercive tactics on its dealers? If they are illegal without past or present evidence of coercion, are they illegal for oil companies which do not have the same relation with their dealers as Atlantic has with its dealers? Are they illegal for oil companies which do not have the same market position as Atlantic? Has the Commission drawn a distinction between sales-commission and purchase-resale TBA promotion plans, condemning the former but approving the latter? If it has, is there a rational basis, consistent with the policies of § 5, for such a distinction? All of these questions appear to me to be inadequately answered by the Commission's opinion.

I do not mean to imply what the answers to any of these questions should be. Congress has entrusted the initial and primary responsibility for answering them to the Commission. However, as this Court has recognized, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States* v. *Chicago, M., St. P. & P. R. Co., supra,* at 511. "The administrative process will best be vindicated by clarity in its exercise." *Phelps Dodge Corp.* v. *Labor Board, supra,* at 197. When the Commission "exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has [properly] exercised the discretion with which Congress has empowered it.'" *Labor Board* v. *Metropolitan Ins. Co., supra,* at 443. See *Burlington Truck Lines* v. *United States, supra,* at 167–169. Administrative agency action is not to be sustained where "its explication is . . . inadequate, irrational or arbitrary . . . ." *Labor Board* v. *Erie Resistor Corp.,* 373 U. S. 221, 236.

Moreover, if in these and the related cases the Commission is laying down the broad rule that all sales-commission TBA promotion arrangements in the oil industry are *per se* unfair methods of competition, such a rule has

neither been clearly articulated nor supported with adequate economic analysis. In *White Motor Co.* v. *United States,* 372 U. S. 253, this Court reversed a district court that had developed a *per se* rule of antitrust liability without regard to an analysis of the economics of the situation. The Court stated, "This is the first case involving a territorial restriction in a *vertical* arrangement; and we know too little of the actual impact of both that restriction and the one respecting customers to reach a conclusion on the bare bones of the documentary evidence before us." 372 U. S., at 261.

Similarly in this case, the Commission has not provided us with a factual record or analysis sufficient to reach the conclusion that sales-commission plans are *per se* illegal in the oil industry. In condemning such arrangements the Commission would be upsetting long-established practices prevalent in the oil industry. It would be affecting the entire oil industry, small companies as well as large, not just the particular parties involved in these cases. Finally, it must be remembered that the Commission is an expert administrative body set up by Congress in order to provide adequate economic fact finding and analyses of complicated problems such as the ones here presented. The integrity of this congressional scheme is violated by the Commission's entering and the courts' affirming broad industry-wide orders the meaning and bases of which are unclear and the factual and economic analysis of which is inadequate.

I do not mean by this that the Commission is required to use a rule-making rather than a case-by-case approach to decision-making in this area, although it would seem that rule-making would here be the preferable approach. Cf. Elman, Comment, Rulemaking Procedures in the FTC's Enforcement of the Merger Law, 78 Harv. L. Rev. 385 (1964). The Commission has the general power to choose to proceed in this field, as in others, through

either rule-making or the process of case-by-case adjudication.  See *Securities Comm'n* v. *Chenery Corp., supra,* at 201–202; *California* v. *Lo-Vaca Gathering Co.,* 379 U. S. 366, 371.  Whichever method the Commission chooses to use, however, it seems obvious to me that the Commission must formulate a clear rational rule which is based on an adequate economic explication and takes into consideration the situation of all industry members affected by the rule.  Since its failure to do so precludes proper judicial review of these cases, I would vacate the judgments below and remand these cases to the Commission so that it can, with clarity, exercise the administrative process entrusted to the Commission by Congress.