Jacob Grumet, J.
The Attorney-General of the State of New York, pursuant to authority vested in him by subdivision 12 of section 63 of the Executive Law, seeks, inter alia, to permanently enjoin the respondents, the iCalogero Corporation and its president, B. J. Calogero, from continuing certain practices, as hereafter indicated, in conjunction (with the sale of gasoline. The respondents operate an automobile service station at 212 Tarrytown Boad, Greenburgh, New York, where they sell Texaco gasoline and offer various automobile services. Although certain discrepancies exist between the Attorney-General’s and the respondents’ description of respondents’ gasoline sale practices, for the purpose of this application, the «court will accept respondents’ version of these practices.
In their affidavit submitted in opposition to this application, and in an exhibit annexed thereto, consisting of a 30-page transcript of a tape recorded presentation which respondents play for all interested customers, the respondents set forth a4' gasoline purchase plan” which the Attorney-General contends is illegal.
. The plan is designed to accommodate approximately 400 monthly purchases of gasoline. Participation in the plan is predicated upon the payment of a monthly fee of $10, which entitles the participants, by prescheduled appointments, to make gasoline purchases of up to ,120 gallons per month. Out of1 this $10 payment, respondents charge $1.60 as the monthly cost of clerical and bookkeeping entries, and the balance, $8.40, is pur *955 portedly maintained in and accumulated in an'11 escrow account ” for the participants. A participant may, at ¡any time, credit his balance in this escrow account towards any purchase at respondents’ .service station, except towards a purchase of gasoline.
Although respondents in their affidavit herein allege that participants may on demand obtain a refund of their balance in the escrow account, the transcript of respondents’ tape recorded presentation is far from clear on this point, stating as it does that 11 no refunds will be made until the program ceases for any reason ” and also that [respondents] will make all refunds, if any, in December [year not specified] ”. Much of the tape recorded presentation is devoted to promoting respondents’ services, i.e., undercoating, air-conditioner servicing, engine steam cleaning, wheel balancing, automobile safety inspections, auto supplies, etc., towards which participants are encouraged to credit their balance in the escrow account.
As to nonparticipants, although the respondents in their affidavit claim they will sell them up to $3 worth of gasoline, in the tape recorded presentation it is stated that as a11 firm policy ’ ’ a nonparticipant whose tank reads a quarter ¡of a tank will be entitled to $1 worth of gasoline. If their tank reads empty, they’ll be given $2 worth of gasoline, and in the case of 11 an emergency, and they plead with [us] then perhaps we may give them three dollars’ worth.”
The respondents contend that such a $3 gasoline limit to nonparticipants is not unreasonable or illegal discrimination, especially since $3 worth of gasoline is all they can buy from a competitor across the street after waiting in line for more than an hour. Although the respondents claim that their gasoline purchase plan has eliminated waiting lines for gasoline at their station, it is unclear .why a competitor across the street, with an alleged ¡$3 gasoline limit (which is identical to respondents’ limit for nonparticipants), continued to have motorists waiting up to an hour for service.
While it appears that, at least for the present, gasoline lines in the northeastern United States have substantially diminished whether this will continue to be so is not known. However, plans such as conceived and offered by the respondents may thrive on anticipated as well as actual shortages, and the present abatement of recent shortages is irrevelant to the issues now before the court.
In order to prevent discrimination by gasoline dealers the Federal Energy Office promulgated in the Code of Federal *956 Regulations (tit. 10, § 210.62, as amd.) on February 11, 1974, published in the Federal Register on February 12, 1974 (39 Federal Register 5311), which provides: “ (b) No supplier shall engage in a/ny form of discrimination among purchasers of any allocated product. For purposes of this paragraph, ‘ discrimination ’ means extending any preference or sales treatment which has the effect of frustrating or impairing the objectives, purposes and intent of this chapter [Code of Fed. Reg, tit. 10, ch. II providing for petroleum allocation] or of the Act [Emergency Petroleum Allocation Act of 1973], and includes, but is not limited to, refusal by a retail marketer of motor gasoline or diesel fuel to furnish or sell any allocated product due to the absence of a prior .selling relationship with the purchaser, or establishment of new volume purchase arrangements where customers of retailers agree in advance to purchase in excess of normal amounts of motor gasoline or diesel fuel and thereby receive preferential treatment.” (Emphasis added.) The respondents’ gasoline purchase plan discriminates against purchasers of gasoline, by establishing a class of preferred customers, and violates both the spirit and the letter of section 210.62 of title 10 of1 the Code of Federal Regulations quoted above. While liberal purchase arrangements are provided for respondents preferred customers “ non-participants ” in respondents purchase plan are admittedly reduced to “pleading” for $3 worth of gasoline if they have an empty tank, and given only $1 worth of gasoline if they have % of a tank. It is unclear what, if any, amount of gasoline they received if they have more than % tank. It was to prevent just such abuses that section 210.62 of title 10 of the Code of Federal Regulations, as amended February 11, 1974 was, promulgated and William 1ST. Walker, General Counsel, of the Federal Energy Office, observed with regard to the necessity of .the February 11, 1974 amendment to section 210:62 quoted above: “This amendment is issued * * * in an effort to end the growing practice of sellers providing preferential treatment to customers on the basis of long-standing relationships or for any other reason. The FEO has noted a serious alteration in established business practices —particularly with respect to gasoline and diesel fuel retail sales — which result in certain purchasers being served, while others are wholly excluded. The amendment to § 210.62 concerning ‘ normal business, practices ’ is addressed to this situation as well as to other preferential sales devices. Sellers whose normal business practice has been to serve the public may not modify that practice to sell only to ‘ regular customers ’ *957 or otherwise arbitrarily discriminate among purchasers of an allocated product. The amendment is also aimed at outlawing new preferential volume purchase arrangements in which retail gasoline customers sign up to purchase for example 1,000 gallons, or $50 worth of gasoline, or this month’s requirement in advance and thereby receive preferential treatment” (39 Federal Register 5311).
Furthermore respondents’ gasoliqe purchase plan violates section 150.20 of the Internal Revenue Service Regulations (Cost of Living Council Phase IV Price Regulations) (38 Federal Register 21598) (August 9, 1973) which provides: “Any practice which constitutes a means to obtain a price higher than is permitted by the regulations in this part is a violation of the regulations in this part. Such practices include, but are not limited to, devices making use of inducements, commissions, kickbacks, retroactive increases, transportation arrangements, premiums, discounts, special privileges, tie-in agreements, trade understandings, falsification of records, substitution of inferior commodities or failure to provide the same .services and equipment previously sold.”
Participants in respondents’ gasoline purchase plan by paying $10 per month for the gasoline privileges specified above are nonetheless paying a higher price for gasoline than is permitted by current price regulations. This is so even if the court were to accept respondents’ claim that only $1.60 out of $10 is actually claimed by the respondent. Respondents’ gratuitious observations that it pays $8.40 out of the $10 into an escrow account for the benefit of the participants is, however, unacceptable .because of the noted ambiguity regarding refund of accumulated monthly payments to the participants. Respondents do not pay participants any interest on the allegedly accumulated portion of the $10 monthly payment, and respondents’ questionable practices regarding refund of such accumulated payments in conjunction with their blatant promotion of ancillary automotive services appears to constitute an illegal tying arrangement. A tying arrangement exists whenever a seller who enjoys a sufficient degree of control over the supply of one article conditions its availability on or otherwise requires the purchase from him of a different product, whether it is a necessary auxiliary or complementary article (Atlantic Refining Co. v. Federal Trade Comm., 381 U. S. 357). In this regard as noted by Collmann in Unfair Competition Trademarks and Monopolies ([3d ed.], § 38.2, subd. [b], par. [1], cl. [e]): “ Even though all the traditional elements of a tie-in may not be evi *958 dent if the net effect is substantially comparable to a true tying arrangement, the evil it generates is the same ”. Respondents are attempting through their gasoline purchase plan to capture a market for their ancillary automobile services, and should not ibe permitted to succeed (Fortner Enterprises v. United States Steel, 394, U. S. 495).
The Attorney-General has demonstrated an ample basis for restraining the respondents from conducting or continuing their gasoline purchase plan and the respondents are so restrained. Upon the settlement of the order to be entered herein, the parties .shall suggest appropriate means by which the respondents may make, necessary refunds to past-participants in respondents ’ gasoline purchase claim, and the Attorney-General shall detail the basis for his application for additional costs pursuant to CPLR 8303 (subd. [a]).