**Emile M. LaPEYRE et al., Petitioners,**

**v.**

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 21787.**

United States Court of Appeals
Fifth Circuit.

Sept. 13, 1966.

Rehearing Denied Nov. 25, 1966.

Jones, Circuit Judge, dissented in part.

Hancock Griffin, Jr., John J. Loflin, Jr., W. D. Keith, Guy W. Shoup, New York City, Louis B. Claverie, New Orleans, La., Joseph H. Smith, New York City, Kelley, Drye, Newhall, Maginnes & Warren, Keith, Johnston, Isner & Desmarais, New York City, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for petitioners.

J. B. Truly, Asst. Gen. Connsel, Gerald Harwood, James McI. Henderson, Gen. Counsel, Frederick H. Mayer, Richard C. Foster, Attys., F. T. C., Washington, D. C. for respondent.

Before JONES and GEWIN, Circuit Judges, and HUNTER, District Judge.

EDWIN F. HUNTER, Jr., District Judge:

Section 5(a) (6) of the Federal Trade Commission Act empowers and directs the Commission "to prevent persons, partnerships or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce." [1] Proceeding under this authority the Commission filed a complaint against Peelers Corporation, Grand Caillou Packing Company, and members of the LaPeyre family. Through Peelers, the family, by virtue of holding certain patents, enjoys a monopoly of the manufacture and distribution of shrimp processing machinery used in shrimp canning. Through Grand Caillou, the family is engaged in the shrimp canning business on the Gulf. Coast. The complaint was issued on May 13, 1960 and charged in substance that petitioners' practices in leasing and selling shrimp processing machines have the tendency to unduly hinder competition and have injured competition in the sale of shrimp and constitute unfair methods of competition and unfair acts and practices within the intent and meaning of Section 5.

Following the conclusion of all hearings, the Examiner, on April 25, 1963, issued his initial decision in which he found Peelers had charged discriminate and substantially higher rental rates to canners located in the States of Oregon, Washington and Alaska than to competing canners located in other states of the United States, thereby violating Section 5 of the Act. He accordingly included in his initial decision an order directing petitioners to cease and desist from discriminating between lessees in the rental charge for their shrimp processing machines. All other allegations of the complaint were dismissed, as was the complaint in its entirety against Grand Caillou. Cross-appeals were taken to the Commission. The Commission, with Commissioner Elman concurring in part and dissenting in part, issued its decision

1. Pertinent provisions of the Act are:
    Section 5(a) (1) [U]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.
    *     *     *     *     *
    (6) The Commission is hereby empowered and directed to prevent persons, partnerships or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce. 66 Stat. 632 as amended, 15 U.S.C. § 45 (a) (1), (6) (1964).

in which it set aside and vacated the initial decision. The Commission made its own findings as detailed in Grand Caillou Packing Company, No. 7887. F. T. C. June 4, 1964, and concluded that petitioners had violated Section 5 by charging shrimp canners in the Northwest a substantially higher rental rate than that charged to canners on the Gulf Coast, *and* by selling shrimp processing machines to foreign shrimp processors, while refusing to sell them to domestic canners who competed with or were potential competitors of the foreign shrimp processors.[2] We have before us the petition to review these conclusions and to set aside the cease and desist order.

The records show the following facts relevant to our decision. Prior to the availability of petitioners' shrimp peeling machinery in 1949, the domestic canners, who were then all located in the Southern part of the United States, utilized hand labor for peeling shrimp. Hand peeling, of course, had many disadvantages, not the least of which was the number of handpickers required to produce a given quantity of peeled shrimp. By 1949 petitioners had perfected their machinery and subsequently offered it to the canning industry. In view of the limited demand, Peelers decided that it would be more profitable to lease than sell the machines to domestic shrimp canners. In order to establish a price which would induce shrimp canners to use their ma-

chines in lieu of hand labor, petitioners had a study prepared which compared the cost of hand peeling with that of machine peeling. Utilizing this study, and drawing upon their own knowledge of the industry, they set a lease fee or rate of fifty-five (55¢) cents for each 100 cycles of the machine's roller. The machines represented such a tremendous advantage and improvement over the hand peeling that eventually all Gulf Coast canners became lessees. The installation of the machines so dramatically lowered the peeling cost that to Gulf Coast canners it became necessary to have their use in order to stay in the shrimp canning business. The decisive advantage over hand peeling was attributable mainly to the machines' capability of peeling smaller shrimp. In using petitioners' machines, it cost no more to peel the tiny shrimp than it did to peel the larger sizes.

In the latter part of 1953, James M. LaPeyre traveled to the West Coast and visited several individuals connected with the fishing industry for the purpose of determining the potential for petitioners' machines in that area. While no final conclusions were reached as a result of the trip, some individuals expressed a definite interest in leasing petitioners' machines. Thereafter, petitioners obtained samples of raw pandalid shrimp,[3] a species different from the shrimp caught in the Gulf of Mexico. These samples were tested on the machines, and it was found that with minor modifica-

---

**2.** Commissioner Elman, in a separate opinion, concurred in the conclusion that petitioners were in violation of Section 5 in charging Northwest canners higher rental rates than Gulf Coast canners, but he differed with the majority on the reason for this conclusion. He dissented from the Commission's holding that petitioners' practice of selling its shrimp processing machines to foreign shrimp processors but not to domestic shrimp processors constituted a violation of Section 5.

**3.** The canners in the Pacific Northwest obtain their raw shrimp from the waters off the coasts of Oregon, Washington, and Alaska. The shrimp found in these waters are cold water shrimp of the pan-

dalid type. In contrast to the penaeid shrimp found in the Gulf of Mexico, the pandalid shrimp are much smaller, running at average counts of more than ninety to the pound of raw heads-on shrimp. As a result of the small size of the raw shrimp, the Northwest canners produce principally only the "tiny" grade of shrimp. Also, in contrast to the Gulf Coast penaeid shrimp, the cold water pandalid shrimp contain less meat per shrimp, since the tail part, from which the meat is obtained, constitutes a smaller proportion of the entire shrimp. In the penaeid shrimp the tail represents approximately 60 percent of the total weight of the shrimp, while in the pandalid shrimp, the tail accounts for only about 40 percent.

tions the equipment could satisfactorily peel the pandalid shrimp. The first lease in the Northwest was in the Fall of 1956 to Edward Kaakinen. The rental rate was fixed at $1.10 per unit increase (100 cycles of the roller), or exactly twice the rate of 55 per unit increase which was being charged the Gulf Coast canners. When petitioners subsequently leased their machines to other shrimp canners in the Northwest, they adhered to this practice of charging twice the rental rate paid by the Gulf Coast canners. They justify the difference on the basis that it was set in order to adhere to petitioner's policy of charging a rate in proportion to labor saved. Stated succinctly, the explanation of the differential is that this charge was warranted, because the shrimp processed by the Northwest canners require—because of smaller size— about twice as much hand labor per pound to process as the larger shrimp processed in the Gulf Coast canneries, and petitioner's machinery is a substitute for hand labor.[4]

Foreign interest in the peeling machines became evident. Accordingly, in order to protect their patent rights abroad, petitioners either obtained patents or else have applications pending on their peeling machinery and shrimp deveiners in some 42 foreign countries where the availability of shrimp indicates a potential demand. In October of 1956 the machines were offered abroad on a lease basis only. In February of 1958 petitioners changed their policy of only leasing their machines abroad and instead decided to sell them in all foreign countries except Mexico and Canada where the machines were still offered on a lease basis. As of January 1, 1962, the machines, with one exception, were all offered for sale abroad and petitioners sold twenty peeling machines, seventeen separators, and sixteen cleaners to customers in eleven foreign countries.

Under the circumstances of this case, is it a violation of Section 5 of the Act for Peelers to charge the Northwest canners twice as much as the Gulf Coast canners for rental of identical machines? The source of the discriminatory effects and of the consequent injury to the Northwest canners is not inequality of bargaining power among customers. It is, rather, the conjunction of two factors: the cost differential in the processing of shrimp by hand as between the Northwest canners and the Gulf Coast canners; and Peelers' monopoly of shrimp processing machinery, which enables the differential in shrimp processing costs to be maintained notwithstanding the substitution of machinery for hand labor. If petitioner did not have a monopoly of shrimp processing machinery, presumably competition would drive the price of such machinery to the Northwest canners down toward the level of the Gulf Coast canners, since the cost of processing shrimp by machine is the same regardless of the size of the shrimp. Conceptually, then, the problem of this case is not one of Robinson-Patman-type discrimination, but of the duty of a lawful monopolist to conduct its business in such a way as to avoid inflicting competitive injury on a class of customers. The Commission found the price differential to be discriminatory, ascertained the requisite adverse effect on commerce, rejected Peelers' claim of justification, and consequently issued a cease and desist order. The majority found that petitioners were attempting to protect their own interests as shrimp canners (Grand Caillou) from the competition of the Northwest canners. Commissioner Elman did not agree on the question of motive. His rationale was that the petitioners were simply attempting to maximize their profits, and that they were charging what the traffic would bear with, as it happens, discriminatory results. We need not resolve these contrary findings as to motive.

4. The record is undisputed that (1) the peeling machines replaced hand labor; (2) that the smaller shrimp of the Northwest ran on the average at least twice as many to a pound of raw heads-on shrimp as in the Gulf; and (3) it took the same amount of hand labor to peel a shrimp regardless of size.

■ Both the majority and Commissioner Elman found that the central characteristic was the same—the utilization of monopoly power in one market resulting in discrimination and the curtailment of competition in another. The Commission's approach is consistent with the broad scope of a Section 5 proceeding. The words "unfair practices" and "unfair methods of competition" are not limited to precise practices that can readily be catalogued. They take their meaning from each case and the impact of particular practices on competition and monopoly. Without further belaboring the issue, it suffices to say that there is abundant evidence in the record to support the Commission's conclusion that Peelers' leasing procedure is innately discriminatory and anti-competitive in its effect, and that in circumstances of the instant case, the refusal to treat the Northwest and the Gulf Coast shrimp canners on equal terms has substantially and unjustifiably injured competition in the shrimp canning industry. It is therefore an unfair method of competition forbidden by Section 5.[5]

■ We now turn to the matter of relief in this regard. The Commission ordered petitioners to cease and desist from:

"(1) Discriminating between lessees of such machinery by charging higher rental or use rates to any lessees than are charged to any other lessee.

"For the purposes of this proceeding, lease or rental terms which result in any lessee paying a higher rate than the rate charged any other lessee for use of respondents' machines for the same period of time or through the same number of mechanical revolutions or operations shall be deemed discriminatory."

The argument is made that the Order is arbitrary, goes too far, and disallows any method of charging other than a rental on the basis of machine use. Congress has placed in the Commission in the first instance the power to shape the remedy necessary to deal with the situation presented. We will interfere only where there is no reasonable relation between the remedy and the violation. Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 473, 72 S.Ct. 800, 96 L.Ed. 1081 (1952). On this record we cannot say that the Commission's remedy is unreasonable, when it is considered that petitioners ask for the right to charge by the number of shrimp or some variation of this method which would result in the same discrimination.

■ A reading of the record and briefs convinces us that the Commission erred in its finding that petitioners violated Section 5 in selling shrimp processing machines to foreign canners while maintaining a policy of leasing to domestic canners. The evidence does not reveal in any manner unlawful purpose. Efforts were made to lease the machines abroad consistent with the domestic leasing policy. However, such leasing was found to be impractical due to exchange problems, import licenses, and the difficulties of servicing machines in foreign countries. Consequently, petitioners found that in order to utilize their foreign patents and develop potential markets, they would have to sell the machines

---

5. Federal Trade Commission v. Brown Shoe Company, Inc., 384 U.S. 1501, 86 S.Ct. 1501, 16 L.Ed.2d 587 decided June 6, 1966; Atlantic Refining Company v. Federal Trade Commission (1965) 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443; Pan American World Airways v. United States (1963) 371 U.S. 296, 307, 83 S. Ct. 476, 9 L.Ed.2d 325. See also Federal Trade Commission v. Motion Picture Advertising Service Co., Inc. (1953) 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426; United States v. Paramount Pictures (1948) 334 U.S. 131, 68 S.Ct. 915, 92 L. Ed. 1260; Federal Trade Commission v. Cement Institute (1948) 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010; Fashion Originators Guild of America v. Federal Trade Commission (1941) 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; Federal Trade Commission v. Beech-Nut Co. (1922) 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307.

abroad. The record as a whole does not contain substantial evidence that the ability of foreign canners to purchase the equipment constitutes an advantage, much less an advantage of considerable proportions, as suggested by the Commission. We agree with Commissioner Elman that "the record tells us altogether too little about the cost of foreign shrimp canners to justify an inference of competitive injury." We find that there is no substantial evidence to support the Commission's finding that the probable effect of selling shrimp processing machines abroad will be to injure and seriously curtail the competitive abilities of the domestic shrimp canners in either the export or domestic market.

■■■ Another question raised by the petition for review is whether the Commission can issue a valid order to cease and desist without the concurrence of a majority of its authorized membership. Three Commissioners participated in this decision. There was one vacancy. Another Commissioner abstained because he had not been appointed until after oral argument. Of the three participating Commissioners, two joined in the opinion and order, and Commissioner Elman filed a separate opinion in which he concurred in the findings that petitioners' leasing practices were "an unfair method of competition forbidden by Section 5," but dissented from the finding that petitioners

injured the competitive opportunities of domestic canners by selling their patented shrimp machinery to foreign shrimp canners. The rules of the Federal Trade Commission provide for decision by the majority of panels of three members.[6] We believe this rule is within the Commission's power to make and is wholly valid. Drath v. Federal Trade Commission, 99 U.S.App.D.C. 289, 239 F.2d 452 (1956), cert. denied 353 U.S. 917, 77 S.Ct. 666, 1 L.Ed.2d 664; Atlantic Refining Company v. F. T. C., 6th Cir. 1965, 344 F.2d 599, cert. denied 382 U.S. 939, 86 S.Ct. 391, 15 L.Ed.2d 350.[7] Moreover, Paragraph 1 of the order is clearly valid, Commissioner Elman having concurred therein.

## CONCLUSION

The first numbered paragraph of the Commission's cease and desist order is affirmed and will be enforced.[8]

Since we have found that the record fails to support the Commission's finding of a probable adverse effect upon competition by reason of petitioner's sales of shrimp processing machines to foreign canners, we set aside paragraph two (2)[9] of the cease and desist order. We are reluctant to set aside this portion of the order without a remand, but there is no indication that any additional evidence is available, and no motion has been made under 15 U.S.C.A. § 45(c).[10]

6. "A majority of the members of the Commission constitutes a quorum for the transaction of business." 16 C.F.R. 1.7.

7. The Court of Appeals for the Ninth Circuit, in Flotill Products, Inc. v. F.T.C., 358 F.2d 224, where the question was decided adversely to the contention of the Commission, did on June 20, 1966, grant a rehearing en banc on this precise question. On August 15, 1966 the 9th Circuit, in a 5–4 decision, affirmed the panel decision.

8. Paragraph 1 orders petitioners to cease and desist from:
"(1) Discriminating between lessees of such machinery by charging higher rental or use rates to any lessee than are charged to any other lessee.

"For the purposes of this proceeding, lease or rental terms which result in any lessee paying a higher rate than the rate charged any other lessee for use of respondents' machines for the same period of time or through the same number of mechanical revolutions or operations shall be deemed discriminatory."

9. Paragraph (2) orders petitioners to cease and desist from:
"(2) Discriminating between foreign and domestic shrimp processors by refusing to sell such machinery to domestic processors upon the same terms and conditions afforded to foreign processors."

10. Rayex Corporation v. F.T.C. (2 Cir. 1963), 317 F.2d 290.

JONES, Circuit Judge (dissenting in part):

It is with regret that I find myself in disagreement with the majority in that portion of the decision which holds that a minority of the Commission can make adjudications. It seems to me that the Congress gave the Commission no such power and I think it cannot assume a power not granted.

It is my belief that the better rule is that of the Ninth Circuit in Flotill Products, Inc. v. F. T. C., 358 F.2d 224, as amended by order filed August 15, 1966. The majority agrees with the Sixth Circuit and the District of Columbia Circuit. The principle that two is a majority of five is as unsound in law as it is in mathematics.

Therefore, I dissent in part.

Rehearing denied; JONES, Circuit Judge, dissenting.