**George J. FULTON, Plaintiff-Appellant,**

v.

**Isadore HECHT et al.,
Defendants-Appellees.**

No. 76–2391.

United States Court of Appeals,
Fifth Circuit.

Sept. 28, 1978.

Rehearing and Rehearing En Banc
Denied Nov. 6, 1978.

Paul Siegel, Paul A. Louis, Miami, Fla., Jay M. Vogelson, Dallas, Tex., for plaintiff-appellant.

Herbert L. Nadeau, Daniel G. LaPorte, Miami, Fla., for defendants-appellees.

Before CLARK and GEE, Circuit Judges, and LYNNE,* District Judge.

GEE, Circuit Judge:

In 1972, West Flagler Kennel Club, a South Florida dog track owned and managed by the individual defendants, refused to renew a booking contract with George Fulton, a breeder and racer of greyhounds. Fulton brought this action, alleging, *inter alia*, violation of federal antitrust laws and commission of a state law tort. The district court entered final judgment for defendants. Plaintiff appeals from the district court's disposition of all his claims with the exception of the dismissal of his breach of contract claim. We affirm.

## BACKGROUND

George Fulton raises and races greyhounds. He maintains a breeding farm in Nueces County, Texas, and up until the events complained of in this lawsuit he had raced his dogs at four South Florida tracks for approximately fifteen years. Three of these tracks, West Flagler Kennel Club, Miami Beach Kennel Club, and Biscayne Kennel Club, are located in Dade County. The fourth, Hollywood Kennel Club, is in neighboring Broward County. The tracks are allocated racing dates by the Florida Board of Business Regulation. Each of the three Dade County tracks operates for approximately 109 days per year, and except for slight overlaps at the beginning and end of a racing season, no two of these tracks are in operation at the same time. The Broward County track is also open 109 days per year during which time one of the Dade County tracks is always in operation.

Contracts between dog owners and the tracks are made on a season-to-season basis. Under these contracts the owner of the track agrees to let the dog owner race at his track, and in return the dog owner promises to race a certain number of dogs at the track. The dog owner receives a share of the track's profits and competes with other dog owners for prize money awarded for dogs who win, place or show.

Following the 1972 summer season West Flagler Kennel Club (Flagler), owned and managed by defendants, refused to renew Fulton's contract for the upcoming fall season. Fulton alleged and presented evidence tending to show that this refusal stemmed from the fact that he had testified before the Board of Business Regulation at its hearing to determine the allocation of racing dates for 1973. Fulton testified in response to a subpoena, and the uncontroverted evidence established that the substance of his testimony was that the facilities at Flagler and Biscayne Kennel Club were comparable. After the hearing the Board awarded the 1973 summer racing dates to Biscayne Kennel Club. The summer dates are the most lucrative for the tracks, and Flagler had usually been awarded those dates.

According to plaintiff's evidence, Isadore Hecht, the managing partner of Flagler, was outraged by plaintiff's testimony and the loss of the summer racing dates. Several witnesses testified that Hecht refused to renew plaintiff's booking contract in retaliation. Witnesses for the defendants testified that Hecht's refusal was not so motivated. They testified that Fulton had always been a trouble-maker and that he had resisted certain innovations, such as marathon and hurdle races, which Flagler had sought to introduce into its racing program.

The four tracks own the only public kennels in the area, Florida Kennels, Inc., which provides facilities for dog owners who race at any of the four area tracks. If a dog owner races at all four tracks he may lease two kennels; a dog owner racing at one, two or three of the tracks may lease only one kennel. Until Flagler refused to renew his contract, plaintiff had been racing at all four tracks and had occupied two kennels. When he lost his contract at Flagler, he also lost his second kennel under the four-track/two-kennel rule.

Plaintiff's motley complaint asserted claims based on: (1) violation of section 2 of the Sherman Act, 15 U.S.C. § 2; (2) viola-

* Senior District Judge of the Northern District of Alabama, sitting by designation.

tion of section 1 of the Sherman Act, 15 U.S.C. § 1; (3) violation of 42 U.S.C. § 1983; (4) violation of 42 U.S.C. § 1985; (5) tort; and (6) breach of contract. The district court dismissed all but the antitrust claims, granted a directed verdict for defendants on the section 2 Sherman Act claim, and entered final judgment on a jury verdict for defendants on the section 1 Sherman Act claim. Another panel of this court has already affirmed the district court's dismissal of the section 1983 claim. *See Fulton v. Hecht*, 545 F.2d 540 (5th Cir.), *cert. denied*, 430 U.S. 984, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). Except for the dismissal of the breach of contract claim, which plaintiff does not appeal, we now consider the remaining issues.

## SECTION 2 CLAIM

Plaintiff makes two arguments in support of his contention that the district court improperly directed a verdict for defendants under section 2 of the Sherman Act, 15 U.S.C. § 2. Essential to both arguments is the assertion that Flagler had monopoly power in the relevant market. First, plaintiff argues that Flagler used its monopoly power to enhance or maintain its monopoly. Second, he argues that as a monopoly Flagler has a duty to deal fairly with dog owners who seek to compete at its track.

Turning first to the common element of both arguments, i. e., the existence of monopoly power in the relevant market, we pause merely to note the presence of some interesting questions which we need not decide. Both sides presented evidence on the definition of the relevant market. Plaintiff sought to introduce an expert's deposition on this issue, but the proffer was not accepted. The cynosure of the relevant market dispute was the Daytona Beach Kennel Club in Volusia County, some 200 miles from the four South Florida tracks. If the Daytona Beach track be not included, Flagler appears to control 25% of the market, since it shares the South Florida dog track market with three other tracks which are, generally speaking, allocated an equal number of racing days per year. If the

Daytona track is included, Flagler's market share would fall to a mere 20%. Plaintiff did race his dogs, at least occasionally, at the Daytona track.

Regardless of whether the Daytona Beach track is included, the defendant's market share is much lower than the percentages that courts have treated as indicative of monopoly power. *See, e. g., United States v. Grinnell Corp.*, 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (87%); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969) (suggesting minimum of 50%); *United States v. Aluminum Co. of America*, 148 F.2d 416, 425 (2d Cir. 1945) (90%). *Cf. United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 343 & n.1 (D.Mass.1953), *aff'd*, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954) (market share not controlling).

But, the plaintiff argues, market share is not the determinative factor in assaying the existence of monopoly power. Monopoly power is "the power to control prices or exclude competition." *United States v. E. I. Du Pont De Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Plaintiff argues that the sterile percentage of market approach should not be applied to the South Florida greyhound racing industry. Although each track may have only 25% of the market, the fact that only one track is operating at any given time makes each track's power significantly greater than that of a firm whose sales represent 25% of a normal market. According to plaintiff, the economics of this industry are such that a dog owner must be able to race year round in order to be competitive. Ignoring the Broward County track for the moment, plaintiff contends that each track has absolute monopoly power during the three months of the year when it is the only track in operation. Thus, each track can dictate the terms of booking contracts.

Plaintiff further argues that the tracks have increased their power by creating Florida Kennels. Through their agreement that a dog owner may lease two kennels only if he races at all four tracks, each

track has the power to take away a kennel from a dog owner who, like plaintiff, races at all four tracks by not renewing the contract for the next season. Just as the economics of the industry require a dog owner to race year round, they also require that a dog owner have two kennels. At least this is plaintiff's contention.

■ Fortunately, we do not have to evaluate plaintiff's arguments for the existence of monopoly power. Assuming *arguendo* that Flagler has a monopoly, plaintiff has failed to make out a section 2 violation because he did not present any evidence that Flagler used its power to enhance or maintain its position. *See United States v. Grinnell Corp.*, 384 U.S. at 570–71, 86 S.Ct. 1698. The Supreme Court's holding in *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), although tarnished in its application to resale price maintenance, *see United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), has yet to be overruled: "In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal . . . ." 250 U.S. at 307, 39 S.Ct. at 468. *Cf. Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). Any monopoly power which the defendant has was thrust upon it by the Florida Board of Business Regulation. Even though the jury could have found that defendants' refusal to renew the contract was in retaliation for the plaintiff's testimony before the Board, such a finding would not support the monopolization claim. Plaintiff argues that

Flagler sought to make an example of him so that other dog owners would not respond to subpoenas in the future. But regardless of whether dog owners do or do not testify in the future, Flagler will continue to receive its allocation of one-third of the racing dates in Dade County. Plaintiff has not suggested that such testimony will cause defendant to lose its present share of the market. Indeed, we cannot see how defendants' market share would be affected at all.

Plaintiff did present evidence that the summer racing dates were the most lucrative for the tracks and that Flagler had usually received the summer dates in the past. After plaintiff testified before the Board that the facilities at Biscayne Kennel Club and Flagler were similar, the Board granted the 1973 summer dates to Biscayne. Thus, defendants might be said to have acted in an effort to maintain or reacquire the summer dates. But plaintiff does not argue that defendants had a monopoly over summer dates.

■ As an alternative to his argument under the traditional standards used by the courts to determine whether a section 2 violation has occurred, plaintiff contends that a monopolist has a duty to deal fairly with anyone who seeks to compete in an adjacent market.[1] According to plaintiff, one who has monopoly control over a market can exclude someone who seeks to compete in a subjacent market only on the basis of reasonable rules and regulations applied equally to all such persons. Plaintiff cites several cases in support of this proposition, but they all contain the essential element of a combination. This situation exists, for example, when several competitors in one market combine to form a single monopolis-

1. Plaintiff also argues that he and Flagler are direct competitors in that, in plaintiff's words, they "compete" for distribution of the track's share of wagers placed by the betting public. Under Florida law, 83% of the wagers placed are returned to the bettors who hold the winning tickets. Of the remaining 17%, 7% is paid to the State of Florida. The last 10% is divided between the track and the dog owners according to the terms of the individual booking contracts. Apparently under industry prac-

tice the track retains 8% and the dog owners receive 2%. Despite plaintiff's efforts to characterize the relationship of the track and the dog owners as a competitive one, it is obvious that they do not "compete" for the division of the pool. The parties are in a vertical relationship similar to that of most buyers and sellers of goods or services, and they negotiate between themselves the price the track pays in return for the dog owners' services.

tic entity in an adjacent market. Such fact patterns bring both section 1 and section 2 of the Sherman Act into play. *See, e. g., Deesen v. Professional Golfers' Association of America,* 358 F.2d 165 (9th Cir.), *cert. denied,* 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966); *Gamco, Inc. v. Providence Fruit & Produce Building, Inc.,* 194 F.2d 484 (1st Cir.), *cert. denied,* 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952); *Blalock v. Ladies Professional Golf Association,* 359 F.Supp. 1260 (N.D.Ga.1973). Since these fact patterns involve section 1's prohibition of combinations in restraint of trade, the courts must judge the acts of the monopolist/combination under a stricter standard than they would that of a truly individual firm. *See, e. g., Eastern States Retail Lumber Dealers' Association v. United States,* 234 U.S. 600, 614, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). This is true even if that individual firm is a monopoly. *See United States v. Colgate, supra.*

 Typical of the cases relied upon by plaintiff is *Deesen v. Professional Golfers' Association of America, supra.* The Professional Golfers' Association (PGA) is, as its name suggests, an organization composed of professional golfers. It sponsors almost all of the professional golf tournaments in the United States and determines which golfers play in those tournaments. Deesen was a golfer who did not meet the eligibility criteria established by the PGA. He claimed that these criteria, created by the agreement of member golfers, constituted an unreasonable restraint of trade in violation of section 1 of the Sherman Act. He also claimed that the PGA had monopolized

the industry in violation of section 2. The court evaluated the reasonableness of the restraints imposed by the eligibility standards and found that their interference with free competition was outweighed by their legitimate purposes and pro-competitive effects. The court thus held that section 1 had not been violated. The court also held that there was no section 2 violation since the PGA had not used its position to exclude any competitor in the market of sponsoring professional golf tournaments, nor had it used its power "to exclude golfers from access to PGA sponsored tournaments" or to hinder competition among professional golfers. 358 F.2d at 171. It is these latter two considerations which tend to support plaintiff's argument that a monopolist cannot discriminate unreasonably in determining who competes in a subjacent market. The parallel which plaintiff seeks to draw is an obvious one: the PGA, which does not compete as a golfer in professional tournaments, can determine who competes in those tournaments only on the basis of reasonable eligibility requirements. A similar test should be applied to a dog track, which does not own the greyhounds competing at the track. While one might read *Deesen* this way, we think that the court's holding and the fact that it considered the reasonableness of the regulations under the section 2 monopoly claim must be limited to the circumstances of that case. The key element, we think, is that the PGA was an association made up of professional golfers, i. e., direct competitors in the market of participating as golfers in professional golf tournaments.[2]

**2.** Although the *Deesen* court did not justify its § 2 analysis on these grounds, we think that our reading of the case is the only way to save that case from creating an unacceptable extension of the scope of § 2. E. g., the court states: "It is the existence of monopoly power coupled with the intent to use it for anticompetitive purposes or with inevitable anticompetitive effects that establishes the offense of monopolization. *United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed.2d 1236." 358 F.2d at 171. This definition, taken loosely from *Griffith,* is correct insofar as it is limited to the type of situation before the Court in *Griffith.* There the Court was confronted with the use of

monopoly power in certain markets, i. e., towns with only one theater, to create monopolies or restrain competition in separate markets, i. e., towns where the defendants competed with other theaters. The anticompetitive purposes and effects were thus aimed at and felt by competitors of the defendants. A broader use of this definition would place more severe restrictions on a monopolist's behavior than § 2 imposes. While it appears that a monopolist could have an anticompetitive purpose only with respect to its competitors or potential competitors, the anticompetitive effects of a monopolist's behavior might occur only in an adjacent market. If such effects, standing by

## SECTION 1 CLAIM

Plaintiff's second antitrust claim, and the only claim presented to the jury, was that the agreement among the four tracks limiting use of two kennels at Florida Kennels, Inc. to those dog owners who raced at all four tracks constituted an unreasonable restraint of trade in violation of section 1 of the Sherman Act. As noted above, Florida Kennels allows a dog owner who races at all four tracks to rent two kennels and a dog owner who races at one, two or three of the tracks to rent only one kennel.

The defendants presented evidence tending to show that the four tracks established the kennels because dog owners needed facilities to house and train their dogs. If a dog owner raced at all four tracks he would frequently be forced to race at two tracks simultaneously. While one kennel is adequate to house and train dogs for racing at one track, a second kennel is needed if the dog owner is at the same time racing at a second track. Since it is possible that one racing at fewer than all four tracks might face overlapping dates, especially if one of the tracks at which he races is the Broward County track, Florida Kennels has a provision which allows such an owner to apply for an extra kennel during the period of conflicting dates.

Plaintiff presented evidence tending to show that there were empty kennels at the Florida Kennels at the time he was deprived of his second kennel. This evidence, if believed by the jury, would undermine defendants' purported rationale for creating the four-track/two-kennel rule and for applying it to plaintiff, i. e., that the kennel space was needed by other dog owners racing at the area tracks. He also presented evidence tending to show that the effect on his ability to compete was devastating. According to plaintiff, one needed two kennels in order to compete effectively even if one raced at less than all four tracks. Plaintiff claims that he was thus forced to sell 36 of his greyhounds in the two years following his loss of the second kennel. Although he continued to race sporadically at the area tracks other than Flagler for several years, he eventually ceased racing in South Florida altogether. Defendants presented evidence that other dog owners racing at all four tracks competed effectively with only one kennel at Florida Kennels and that numerous dog owners competed at fewer than all four tracks with one or no kennel at Florida Kennels.

■ The evidence clearly presented a jury issue on the reasonableness of the agreement. The jury held in favor of the defendants, and that finding should not be disturbed here.

■ Plaintiff's main attack on the section 1 claim is that the judge erred in the way he presented the issues to the jury. He contends that the court improperly restricted the jury in its consideration of the

themselves were sufficient to constitute a violation of § 2, the right of a single firm to refuse to deal with another, recognized in *Colgate, supra,* would be significantly reduced. Not only would a firm's unilateral refusal to deal violate § 2 if it was done to enhance or maintain the monopoly, such a refusal would also violate § 2 if it had an inevitable anticompetitive effect in an adjacent market. This limitation on the *Colgate* doctrine is justifiable if the monopoly is really just an association of competitors in the market where the anticompetitive effects are felt. *See United States v. Terminal Railroad Ass'n,* 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). However, we think any broader reading of § 2, with the accompanying private cause of action under § 4 of the Clayton Act, 15 U.S.C. § 15, would be unwise.

This is not to say that a monopolist's behavior having inevitable anticompetitive or other undesirable economic effects solely in an adjacent market can never violate any of the antitrust statutes. E. g., this court has held that § 5 of the Federal Trade Commission (FTC) Act, 15 U.S.C. § 45, prohibits a monopolist from discriminating between buyers in the price he charges for his product. *See LaPeyre v. FTC,* 366 F.2d 117 (5th Cir. 1966). Thus, under § 5 of the FTC Act, a monopolist may be required to use uniform and reasonable criteria when dealing with those who compete in an adjacent market. Such a duty is no help to the instant plaintiff because his action is based on § 2 of the Sherman Act, and there is no private cause of action for violation of the FTC Act. *See, e. g., Holloway v. Bristol-Myers Corp.,* 158 U.S.App.D.C. 207, 485 F.2d 986 (1973); *Carlson v. Coca-Cola Co.,* 483 F.2d 279 (9th Cir. 1973).

relevant facts in that it refused to instruct the jury to consider Flagler's nonrenewal of the contract, and the reasons therefor, in evaluating the reasonableness of the four tracks' agreement. However, plaintiff presented no evidence that it was part of the agreement among the four tracks that he, or anyone else, would not have his booking contract renewed for testifying before the Board of Business Regulation or for any other reason. In other words, there is no indication that any specific refusal to enter or renew a booking contract was within the scope of the agreement.

Nonetheless, it was obviously envisioned by the four tracks that any one of them could trigger the four-track/two-kennel rule by refusing to renew a contract for reasons sufficient to that individual track. Thus, the district court properly told the jury that it could consider the possibility that one track owner might arbitrarily or unreasonably not allow someone to race at his track in determining the overall reasonableness of the agreement. The court's refusal to package the issue as plaintiff wished was not error.

Plaintiff also complains of several other aspects of the instructions to the jury. These objections are all frivolous and not worthy of discussion.

## SECTION 1985 CLAIM

In Count IV of his first amended complaint the plaintiff alleged that the defendants had conspired to deprive him of his constitutional rights in violation of 42 U.S.C. § 1985. The district court dismissed this claim because plaintiff failed to allege a racial or other class-based animus. *See Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). Plaintiff now contends that he could have alleged a class-based animus if only the district court had allowed him to amend his complaint.

■ Although the district court did not expressly grant leave to amend this count in its order dismissing the section 1985 claim, it did consider plaintiff's subsequent motion for leave to file a second amended complaint. The tendered amended com-plaint merely restated verbatim the section 1985 count from the first amended complaint. Since the plaintiff had not cured the deficiency, the court properly refused to grant plaintiff's motion. At no time did plaintiff make an effort to correct his claim to include an allegation of class-based animus, and there is no indication in the record that the district court would not have allowed an amendment containing the necessary elements. The action of the district court was inarguably fair and correct.

## THE TORT CLAIM

In addition to his claims under federal law, the plaintiff alleged in his complaint that the defendants had committed an unnamed and hitherto unrecognized tort under Florida law. The district court dismissed this count for failure to state a claim. On appeal the plaintiff argues that the mere fact that the tort has not been recognized in the past does not mean that such a cause of action does not exist. He contends that the district court should have heard the claim on either of two theories: (1) intentional infliction of economic harm, or (2) interference with state administrative proceedings.

■ The only act committed by the defendants was the refusal to renew a contract which had, by its own terms, expired. Obviously, the defendants had no contractual duty to renew. Indeed, it appears to us that the defendants were under no duty of any sort to renew the contract. The law of tort is well established that an individual can refuse to enter into a contract or to maintain a business relationship terminable at will for any reason sufficient to himself. *See House of Materials, Inc. v. Simplicity Pattern Co.,* 298 F.2d 867, 872–73 (2d Cir. 1962), *citing, inter alia,* 4 RESTATEMENT OF TORTS § 762, comments a, b and c. In the only discovered Florida case that addresses the issue, the Florida court expressed its agreement with this uniformly accepted principle. *See NAACP v. Webb's City, Inc.,* 152 So.2d 179, 183 (Fla.Dist.Ct. App.1963), *vacated as moot,* 376 U.S. 190, 84

S.Ct. 635, 11 L.Ed.2d 602 (1964). Thus, it is clear that plaintiff has no cause of action in tort. Even if defendants did intentionally inflict economic harm on the plaintiff, such behavior is tolerated by the law because of the state's interest in protecting the individual freedom to enter, or to refrain from entering, into contractual relationships.

Furthermore, plaintiff does not state a cause of action in tort under his allegation of interference with an administrative agency. Assuming that the defendants caused such an interference, that does not make their action wrongful to the plaintiff. Any harm to the state's ability to govern can be adequately vindicated in an action brought by the state.

Having carefully considered all the claims raised by plaintiff, including those not decided by this court in plaintiff's first appeal, see Fulton v. Hecht, 545 F.2d 540 (5th Cir.), cert. denied, 430 U.S. 984, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977), we find that the district court's disposition of the case was in all respects correct. Accordingly, the judgment of the district court is AFFIRMED.