**OFFICIAL AIRLINE GUIDES,
INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION,
Respondent.**

No. 1217, Docket 80–4028.

United States Court of Appeals,
Second Circuit.

Argued June 17, 1980.

Decided Sept. 18, 1980.

George W. McBurney, Sidley & Austin, Chicago, Ill. (Elroy H. Wolff, Thomas J. Hearity, Sidley & Austin, Washington, D. C., Edward Wolfe, White & Case, William H. Buchanan, Jr., New York City, on brief), for petitioner.

Howard E. Shapiro, Washington, D. C. (Michael N. Sohn, David C. Shonka, W. Dennis Cross, James C. Egan, Jr., Steven A. Newborn, Federal Trade Commission, Washington, D. C., on brief), for respondent.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and NICKERSON, District Judge.*

OAKES, Circuit Judge:

This appeal raises the question whether a monopolist publisher of flight schedules not itself an air carrier has some duty under the Federal Trade Commission (FTC) Act not to discriminate unjustifiably between certificated air carriers and commuter airlines so as to place the latter at a significant competitive disadvantage. Petitioner, Official Airline Guides, Inc., which took over publication of the Official Airline Guide from The Reuben H. Donnelley Corp. (Donnelley) in 1979, challenges an FTC order, *In re The Reuben H. Donnelley Corp.*, [1980] 3 Trade Reg.Rep. (CCH) ¶ 21,650. The order requires Donnelley to publish in the North American edition of its guide, known as the "OAG," connecting flight listings for commuter airlines in the same manner as it publishes connecting flight listings for certificated airlines, and to refrain from arbitrarily discriminating against any air carrier or class of carriers in publishing connecting flight listings. The guide is a semi—monthly publication that provides detailed information on flight schedules and fares in North America. We find the petitioner's three defenses—that (1) the FTC lacks jurisdiction under the Act to regulate petitioner in this case, (2) there is a lack of substantial evidence in the record to support the Commission's findings, and (3) the petitioner's voluntary compliance prior to conclusion of the FTC proceedings prevents a cease and desist order—all to be unavailing. At the same time we find for the petitioner on the merits of the underlying legal question and we do not reach petitioner's First Amendment defense to the order.

Since 1969 the North American edition of the Official Airline Guide (OAG), the "bible" of the industry, has been the only publication distributed in the United States that combines the North American passenger flight schedules of all scheduled domes-

---

* Of the Eastern District of New York, sitting by designation.

tic air carriers. It is the "primary market tool of . . . virtually every [air] carrier . . . in the United States," and is the standard reference for airline ticket offices, travel agents, businesses, and the public generally, although it has apparently been displaced to some extent by computerized scheduling.

At the time the Commission's complaint was issued in this proceeding, the (OAG) contained four categories of flight schedules: (1) direct flights of certificated carriers, that is, flights which do not involve a change of aircraft between two cities; (2) connecting flights of certificated carriers, that is, flights involving the use of one direct flight in conjunction with another to provide transportation between two cities; (3) direct flights of intrastate air carriers; and (4) direct flights of commuter air carriers. Under Donnelley's publication policy a user of the (OAG) was not readily apprised of connecting flights of commuter air carriers. For example, there are no direct flights between Los Angeles and Rutland, Vermont, and the (OAG) listed only those connections involving certificated carriers. A user of the (OAG), therefore, might be directed to Rutland from Los Angeles by way of Boston, because all three cities are or have been served by direct flights of certificated carriers. A user of the guide, unless he "constructed a connection," would not be informed of commuter connections from intermediate cities, such as New York or Hartford, which may not serve Rutland by direct flights of certificated carriers, even though these cities may be more convenient to the Los Angeles traveler than a flight through Boston. "Constructing a connection" obviously requires looking for direct flights serving points intermediate to the two cities between which the traveler is

flying. Because constructing a connection is difficult and time-consuming, it is important to have connecting flights listed in the OAG. Certificated carriers paid Donnelley in 1975 alone hundreds of thousands of dollars in order to have their flights listed.

As a result of OAG's failure to list the connecting flight schedules of commuter airlines, the Commission found that the latter were handicapped in competing with certificated carriers in markets that were served by both, which included some 432 "city pairs" as of April 1975, a "city pair" being two cities between which there is scheduled airline service. Commuter airlines sought as early as 1969 to have Donnelley publish commuter connections in the OAG. At one time, Donnelley representatives did sit down with the certificated carriers' trade association, the Air Traffic Conference, to discuss the commuter connection problem, but evidently the certificated carriers were not interested in the increase in competition, and the subject was dropped. It may be noted parenthetically that the administrative law judge's finding that there was a conspiracy between the certificated air carriers and Donnelley was overturned by the full Commission.

In 1975 the FTC staff undertook an investigation into Donnelley's publication policies and Donnelley then expressed a willingness to modify its practices without, however, agreeing to do so in a binding or enforceable agreement. On April 13, 1976, the Commission issued its complaint, charging that Donnelley had violated section 5 of the FTC Act,[1] first, by refusing to publish the connecting schedules of commuter air carriers; second, by failing to merge the direct flight schedules of commuter air carriers that it did publish with similar sched-

---

1. Section 5 of the FTC Act, 15 U.S.C. § 45, provides in pertinent part:

(a)(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

(2) The Commission is empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition in or affecting commerce.

ules of certificated carriers; and third, by conspiring with others in restraint of trade. The administrative law judge found against Donnelley on all counts, but the full Commission reversed him as to the second and third counts, holding that Donnelley had sufficient business justification for not merging into a single listing the schedules of commuter air carriers and certificated carriers, and that the record did not support a finding of any conspiracy. The Commission did, however, affirm the administrative law judge in finding a section 5 violation in Donnelley's arbitrary refusal to publish the connecting flight schedules of commuter air carriers. The Commission's order directed Donnelley to "cease and desist from failing to publish connecting flight listings for commuter air carriers pursuant to whatever guidelines govern the publication of connecting flight listings for certificated carriers" and petitioner filed the pending petition for review, as to which we have jurisdiction under section 5(c) and (d) of the FTC Act, 15 U.S.C. § 45(c)–(d).

## I. Jurisdiction of the FTC

■ Petitioner's first argument is that the Commission lacks jurisdiction over it in this case.[2] Section 5(a)(2) empowers the Commission "to prevent . . . corporations, except . . . air carriers . . subject to the Federal Aviation Act of 1958, . . . from using unfair methods of competition . . . and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(2).[3]

Donnelley is not subject to the Federal Aviation Act and, therefore Donnelley is really arguing that the FTC cannot even regulate non–carrier corporations when the FTC's purpose is to prevent unfair competition in the airline industry. But this argument confuses the broad mandate given to the Commission to enforce section 5 with the narrow exemption from the Commission's jurisdiction that is granted to air carriers subject to CAB jurisdiction. The analogous surface common carrier exemption in the FTC Act, as the Seventh Circuit has held, "is in terms of status as a common carrier subject to the Interstate Commerce Act, not activities subject to regulation under that Act." *FTC v. Miller*, 549 F.2d 452, 455 (7th Cir. 1977). Similarly, here, it is of no significance that the publishing of airline schedules is an activity affecting competition among air carriers subject to the Federal Aviation Act. Since Donnelley is not itself an air carrier, it is not beyond the Commission's jurisdiction. *Cf. Breen Air Freight, Ltd. v. Air Cargo, Inc.*, 470 F.2d 767, 771–72 (2d Cir. 1972) (corporation formed as subsidiary of airlines for purpose of acting as agent for terminal and cartage services was not an "air carrier" within Federal Aviation Act), *cert. denied*, 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1973).

The only case that petitioner really has to go on is *Fruit Growers' Express Inc. v. FTC*, 274 F. 205 (7th Cir. 1921), *cert. dismissed*, 261 U.S. 629, 43 S.Ct. 518, 67 L.Ed. 835 (1923). In that case the Commission had issued a cease and desist order, holding unlawful a contract between the petitioner supplier of equipment and certain common carriers who were exempt from the Commission's jurisdiction. The reviewing court held that the carriers were necessary parties to any proceeding concerning the contract, and therefore the Commission could not enter any order affecting it because the carriers were all subject to exclusive ICC jurisdiction. But in the present case there is no claim that air carriers are necessary parties. The Commission has specifically found Donnelley's action to be unilateral abuse of its market position and has specifi-

---

**2.** In an earlier case in the Northern District of Illinois, Donnelley prevailed in this argument. *Reuben H. Donnelley Corp. v. FTC*, [1977] 2 Trade Cas. (CCH) ' 61,721 (N.D.Ill.1977). The judgment in that case was later vacated for failure to exhaust administrative remedies, [1977] 2 Trade Cas. (CCH) ' 61,783 (N.D.Ill. 1977), and following cross appeals from the

vacatur the court of appeals held that venue in the Northern District of Illinois was improper, 580 F.2d 264 (7th Cir. 1978). We therefore do not think that the original district court decision is in any sense authoritative and, as well, we think it was erroneous.

**3.** See note 1 *supra*.

cally found that air carriers were not parties to the allegedly illegal acts.

## II. Substantial Evidence

■ Petitioner argues that the Commission did not properly find that Donnelley arbitrarily injured competition among air carriers. However, substantial evidence supports the Commission's findings of significant competition between certificated and commuter carriers, and of injury to that competition, as well as the finding that Donnelley "arbitrarily" refused to publish the connecting flight schedules of commuter carriers.

Petitioner argues that competition between the certificated and commuter carriers is *de minimis* inasmuch as the approximately one million passengers carried by commuters in 1974 constituted but a small fraction of the total of some 190 million carried by certificated carriers. But in eighty–two city pairs commuter carriers served almost a million passengers in 1973 and 900,000 passengers in 1974, while certificated carriers served about four million persons in those markets. Thus tens of millions of dollars of revenues are involved in the carrying of passengers by commuter and certificated carriers in the city pairs in which they compete, and this is clearly not "insignificant or insubstantial." *See United ed States v. Consolidated Laundries Corp.*, 291 F.2d 563, 572 (2d Cir. 1961) ($523,000 in linen supply business not "insignificant or insubstantial"); *see also International Salt Co. v. United States*, 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947).

Petitioner further claims that the commuter carriers were not injured by its actions and cites the fact that 70% of commuter air traffic in 1971 was comprised of connecting passengers. But this fact merely shows the extent to which commuter carriers depend on connecting traffic and tells us nothing about the number of passengers who never learned of the commuters' unpublished connecting schedules. The Commission's finding that there is little chance that the availability of unpublished connecting flights will be known was properly predicated upon the testimony of industry witnesses, the statements of travel agents and others, and inferences drawn from the Commission's awareness of the OAG's role in the air travel industry and from the reported increases in commuter traffic that did occur after Donnelley began publishing the connecting flight schedules of commuter airlines.

■ Moreover, Donnelley did not offer the Commission any explanation for its refusal to list commuter connecting flights. While Donnelley now says that it considered the issue to be factually moot, and that its reasons for not publishing the commuter connecting flight schedules prior to 1976 were essentially the same as its reasons for not merging the direct flight schedule listings of commuter and certificated carriers (as to which the Commission, with one dissent, found business justification), neither explanation has merit. There is no mootness defense. *See SCM Corp. v. FTC*, 565 F.2d 807, 812–13 (2d Cir. 1977). And Donnelley's asserted business justification–that commuter airlines are less reliable than certificated airlines–does not explain why it was willing to list direct commuter flights (albeit separately) but not connecting commuter flights. The total expense involved, once Donnelley started listing connecting commuter flights, was $6,000, and the change in policy was made with apparent ease and no ill effects. Thus, since in Donnelley's own view commuter airlines' schedules were not inherently unreliable, and the cost and effort involved in listing them were not excessive, the Commission could properly find Donnelley's refusal to publish them arbitrary.

■ Donnelley, however, contends that the Commission itself is arbitrary. Donnelley argues that under the Commission's standard if a monopoly were to act in its own economic self–interest the Commission would seize upon that fact and declare such behavior to be monopolization in violation of section 2 of the Sherman Act, while if it could not show any economic self–interest the Commission would find it to be acting "arbitrarily." But this argument ignores

the fact that section 2 of the Sherman Act does not forbid a monopolist from ever acting in its own self–interest. *See Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 281–82 (2d Cir. 1979), *cert. denied,* —— U.S. ——, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Petitioner also ignores the Commission's conclusion that "[i]n examining the question of business justifications, the economic self interest of the monopolist would be the major but not the exclusive consideration," and that "[w]here there is little justification for a business policy, the antitrust laws can require that the monopolist take into account the effect on competition of its actions in the line of commerce made up of its customers, suppliers, or others wishing to deal with it." [1980] 3 Trade Reg.Rep. (CCH) ¶ 21,650, at 21,819. We see nothing arbitrary in the Commission's finding that Donnelley's policy of not merging schedules into single classifications was reasonable while its policy of not publishing commuter schedules at all was arbitrary, since withholding a group of schedules from publication in toto and disclosing the information but dividing it into separate listings are two entirely different matters.

### III. Legal Duty of a Monopolist *vis–a–vis* its Customers

■ We turn then to the crucial issue in the case, whether Donnelley as a monopolist had some duty under section 5 of the FTC Act not to discriminate unjustifiably between the competing classes of carriers so as to place one class at a significant competitive disadvantage. In other words, does the FTC Act authorize the Commission to find unlawful the type of challenged activity engaged in by petitioner? The Commission itself recognized that "[t]he question we are presented with is outside the mainstream of law concerning monopolies and monopolization." [1980] 3 Trade Reg.Rep. (CCH) ¶ 21,650, at 21,816.

On the one hand, the petitioner refers us to the principle expressed in *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919), that

[i]n the absence of any purpose to create or maintain a monopoly, the [Sherman Act] does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. The Commission did not find in the present case "any purpose to create or maintain a monopoly," but went on to say that "the philosophy of *Colgate* must give way to a limited extent where the business judgment is exercised by a monopolist in an arbitrary way." The Commission conceded that its result "may be inconsistent to some extent with the theory of the *Colgate* doctrine." [1980] 3 Trade Reg.Rep. (CCH) ¶ 21,650, at 21,818 n. 37.

The Commission's brief, however, refers us to two lines of cases with which it claims its decision is consistent. The first line recognizes limitations that may be placed upon a monopolist's rights to affect competition. Thus, in *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), the Court held that a monopolist newspaper violated section 2 of the Sherman Act by refusing to sell advertising space to merchants who also purchased air advertising time from a local radio station. Though recognizing the general right of a private business to select its customers, the Court held that the exercise of this right for the purpose of monopolization violates the Sherman Act. *Id.* at 155, 72 S.Ct. at 187. But *Lorain Journal*, unlike the present case, involved a monopolist seeking to preserve its *own* monopoly. The Commission similarly argues that its position is supported by *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), where the Court held that a monopolist may not abuse its monopoly power in one market to gain an improper advantage or to destroy threatened competition in an adjacent market in which it also operates. *See id.* at 377–79, 93 S.Ct. at 1029–1030. But as the Commission itself pointed out, the instant case "differs from ordinary monopolization cases where challenged acts or practices were engaged in to benefit the monopolist competitively, either

in the market in which the monopoly power existed or in some adjacent market into which the monopolist had extended its operations." [1980] 3 Trade Reg.Rep. (CCH) ¶ 21,650, at 21,815. Donnelley, though possibly a monopolist in the airline schedule publishing industry, admittedly had no anticompetitive motive or intent with respect to the airline industry and is engaged in a different line of commerce from that of the air carriers.

The second line of cases relied upon in the Commission's brief recognizes the duty that the joint owners of a scarce resource have to make the resource available to all potential users on nondiscriminatory terms. Thus in *Associated Press v. United States*, 326 U.S. 1, 15–18, 65 S.Ct. 1416, 1422–1423, 89 L.Ed. 2013 (1945), the Court held that the members of a news–gathering cooperative association could not lawfully enforce a by–law provision that allowed any member to block nonmember competitors from becoming members. So too, in *United States v. Terminal Railroad Association*, 224 U.S. 383, 410–12, 32 S.Ct. 507, 515–516, 56 L.Ed. 810 (1912), the Court held that an association of railroad companies controlling access to the city's only terminal facilities had to make them available to nonmembers on reasonable, nondiscriminatory terms. And in *Silver v. New York Stock Exchange*, 373 U.S. 341, 347–49, 364, 83 S.Ct. 1246, 1251–1252, 1260, 10 L.Ed.2d 389 (1963), the Court held that the New York Stock Exchange and its members violated section 1 of the Sherman Act when they jointly denied nonmember broker–dealers access to private wire services with certain Exchange members. Each of these cases, however, involved joint refusals to deal resulting in injury to the *defendants'* competitors, while the instant case involves only unilateral behavior by Donnelley which allegedly has affected competition among air carriers, a business in which Donnelley is not engaged.

The closest case that the Commission could cite is *Grand Caillou Packing Co.*, 65 F.T.C. 799 (1964), *aff'd in part rev'd in part sub nom. LaPeyre v. FTC*, 366 F.2d 117 (5th Cir. 1966). In that case a monopolist manufacturer of shrimp peeling machinery leased

the peeling equipment to shrimp canners in the Northwest United States at rental rates substantially higher than those charged to canners on the Gulf Coast, where the manufacturer also ran its own canning operation. The Commission held that this discriminatory pricing policy violated section 5, as the monopolist had improperly attempted to protect its own shrimp canning operations from competition by other canners. *Id.* at 839, 848. Commissioner Elman, concurring stated that the record did not support a finding of anticompetitive intent, and argued that the monopolist had merely been charging what the traffic would bear in an attempt to maximize profits. *Id.* at 866–67. It was Commissioner Elman's reasoning that the monopolist nevertheless had violated section 5 by breaching its duty to treat all users of its equipment fairly, *id.* at 868–69, on which the Commission in this case pinned its holding. *See Reuben H. Donnelley Corp.*, [1980] 3 Trade Reg.Rep. (CCH) ¶ 21,650, at 21,816–17.

The Fifth Circuit, in reviewing *LaPeyre*, held that it need not decide whether the record supported the majority's finding of discriminatory intent because it was clear that the conduct violated section 5 by unjustly discriminating between classes of users. 366 F.2d at 120–21. Thus the Commission argues that *LaPeyre* stands for the proposition that a lack of anticompetitive motive or intent will not, under section 5 of the FTC Act, justify a monopolist's arbitrarily injuring competition in an adjacent market. *See also Fulton v. Hecht*, 580 F.2d 1243, 1248 n. 2 (5th Cir. 1978) (citing *LaPeyre* for this proposition, but distinguishing it in that case), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979). Yet the fact remains that the utilization of monopoly power in one market in *LaPeyre* resulted in discrimination and the curtailment of competition in another market in which the monopolist himself was also engaged, and this surely distinguishes *LaPeyre* from the present case. *See generally* 3 P. Areeda & D. Turner, *Antitrust Law* 238–39, 273–76 (1978).

Conceding in effect that there is no case precisely in point, the Commission suggested in oral argument that it was but a "small step" that we would be taking were we to uphold their decision. Of course we are reminded by the line of cases including *FTC v. Cement Institute*, 333 U.S. 683, 692–93, 720, 68 S.Ct. 793, 799, 812, 92 L.Ed. 1010 (1948) and *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 367–68, 85 S.Ct. 1498, 1505, 14 L.Ed.2d 443 (1965),[4] that "[w]hile the final word is left to the courts, necessarily 'we give great weight to the Commission's conclusion . . . .' " as to what is an "unfair method of competition" or "an unfair act or practice" within the meaning of section 5 of the FTC Act. We note that the FTC with some justification states that the arbitrary refusal of a monopolist to deal leaves the disadvantaged competitor, even though in another field, with no recourse to overcome the disadvantage, and the Commission wants us to take the "small step" in terms of "the fundamental goals of antitrust." *Reuben H. Donnelley Corp.*, [1980] 3 Trade Reg.Rep. (CCH) ¶ 21,650, at 21,818.

But we think enforcement of the FTC's order here would give the FTC too much power to substitute its own business judgment for that of the monopolist in any decision that arguably affects competition in another industry. Such a decision would permit the FTC to delve into, as the Commission itself put the extreme case, "social, political, or personal reasons" for a monopolist's refusal to deal. *See id.* Professors Areeda and Turner give examples of a monopolist theater which refuses to admit men with long hair or a monopolist newspaper which refuses to publish advertising from cigarette manufacturers. 3 P. Areeda & D. Turner, *supra*, at 270–71. The Commission says that neither of these examples would trigger antitrust scrutiny because there is no competition among persons who attend movies, and refusing to publish advertise-

ments for all cigarette companies would not place any of them at a disadvantage *vis-a-vis* a competitor. *See* [1980] 3 Trade Reg. Rep. (CCH) ¶ 21,650, at 21,818. Nevertheless, the Commission's own example in footnote 38 of its opinion of a monopolist newspaper refusing to take advertisements from a particular cigarette company because of the style of prior advertisements or the political views of its president shows just how far the Commission's opinion could lead us. What we are doing, as the Commission itself recognized, is weighing benefits to competition in the other field against the detrimental effect of allowing the Commission to pass judgment on many business decisions of the monopolist that arguably discriminate among customers in some way. Thus, if the only supermarket in town decides to stock Birdseye vegetables but not Green Giant vegetables, the FTC would be able to require it to stock Green Giant vegetables if it were to find Green Giant competitively disadvantaged.

■ We do not think that the *Colgate* doctrine is as dead as the Commission would have it. Only recently we said as much in *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978): "[i]t has always been the prerogative of a manufacturer to decide with whom it will deal." And the Supreme Court in *Reeves, Inc. v. Stake*, —— U.S. ——, ——, 100 S.Ct. 2271, 2278, 65 L.Ed.2d 244 (1980), has again referred to " 'the long recognized right of trader or manufacturer, engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' " *United States v. Colgate & Co.*, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919)." We think that even a monopolist, as long as he has no purpose to restrain

---

4. *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965) and other "TBA" cases (tires, batteries and accessories) contain some language that the administrative law judge in this case found helpful, at least by analogy. They were not, however, cited by the Commission either in its opinion or in its brief

before us, presumably because they involve, as Judge Goldberg pointed out in *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 377 n. 10 (5th Cir. 1977), elements of coercion, rather than mere refusal to deal.

competition or to enhance or expand his monopoly, and does not act coercively, retains this right. Absent enlightenment from above, or clarification from Congress, this is our decision on the merits.

IV. Mootness of Case

If the Commission were correct, however, that failure of petitioner to publish commuter airlines connecting flight schedules amounted to an antitrust violation, the fact that petitioner had already begun to publish such information before the conclusion of the proceedings would not make the cease and desist order invalid. In such a situation, as we have held, the Commission has "discretion" to find that an order is warranted because of the possibility of unlawful recurrence of the activity. *SCM Corp. v. FTC (I)*, 565 F.2d 807, 812–13 (2d Cir. 1977); *see also SCM Corp. v. FTC (II)*, 612 F.2d 707 (2d Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 80, 66 L.Ed.2d 23 (1980). There is no evidence in our case that the FTC imposed any improper burden on the petitioner, which was the reason for the remand in *SCM Corp. v. FTC (I)*, and we see no evidence of an abuse of discretion since quite plainly the mere cessation of illegal activity—even coupled with a promise to obey the law in the future—will not defeat the entry of a cease and desist order. *Fedders Corp. v. FTC*, 529 F.2d 1398, 1403 (2d Cir.), *cert. denied*, 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976); *see Jay Norris, Inc. v. FTC*, 598 F.2d 1244, 1251 (2d Cir.), *cert. denied*, 444 U.S. 980, 100 S.Ct. 481, 62 L.Ed.2d 406 (1979).

As previously stated, we need not reach petitioner's First Amendment claim.

Petition to review granted; Commission order reversed for reasons stated above.